349 Mass. 69 (1965)
206 N.E.2d 403
ATTORNEY GENERAL
vs.
A BOOK NAMED "JOHN CLELAND'S MEMOIRS OF A WOMAN OF PLEASURE."
Supreme Judicial Court of Massachusetts, Suffolk.
January 8, 1965.
April 22, 1965.
Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK, SPIEGEL, & REARDON, JJ.
Charles Rembar of New York (Reuben Goodman with him) for the intervener.
William I. Cowin, Assistant Attorney General (John E. Sullivan, Assistant Attorney General with him), for the Attorney General.
Henry P. Monaghan for the Civil Liberties Union of Massachusetts & others, amici curiae, submitted a brief.
SPALDING, J.
This is an appeal from a final decree holding the book, "John Cleland's Memoirs of a Woman of Pleasure" (Memoirs), more commonly known as "Fanny Hill," obscene, indecent and impure under G.L.c. 272, §§ 28C, 28E, and 28F (inserted by St. 1945, c. 278, § 1).[1] *70 The petition was brought by the Attorney General. The publisher of the book, G.P. Putnam's Sons, intervened as a party. No jury trial having been claimed under § 28D, the case was heard by a judge. The evidence consisted of the book, various newspaper articles, book reviews and the testimony of several experts in the field of literature. The judge made careful and complete findings of fact and discussed the relevant law exhaustively.
Memoirs was written in England in 1749. For over two centuries it has had for the most part a surreptitious circulation. Memoirs has, for example, previously been a source of litigation in this Commonwealth (see Commonwealth v. Holmes, 17 Mass. 336), and very recently it has been the subject of decisions by other courts. See Larkin v. G.P. Putnam's Sons, 14 N.Y.2d 399; G.P. Putnam's Sons v. Calissi, 86 N.J. Super. 82.
The sole question is whether the publication of Memoirs is protected by the First Amendment to the United States Constitution, as made applicable to the States by the Fourteenth Amendment. Since a majority of the court held in Roth v. United States, 354 U.S. 476, 485, "that obscenity is not within the area of constitutionally protected speech or press," the question becomes one of determining whether or not Memoirs is obscene.
The book takes the form of two letters written by a prostitute in which she recounts her life since she, a country girl, was abandoned in London. It concentrates on her sexual experiences, both normal and abnormal, which are described in minute detail. Memoirs, as is conceded by the intervener, is erotic. Erotica and obscenity, however, are not synonymous. The fact that Memoirs may arouse sexual thoughts and desires is not, in itself, sufficient to deprive *71 it of its constitutional protection. If the contrary were the case, the public could be deprived of many of the world's greatest literary and artistic works. Our task, then, is to trace, as best we can, the "dim and uncertain line" which separates obscenity from that which is protected by the First Amendment. See Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 66; Jacobellis v. Ohio, 378 U.S. 184, 187. We are under no illusions as to the difficulties involved in "facing up to the tough individual problems of constitutional judgment involved in every obscenity case." Roth v. United States, 354 U.S. 476, 498.
The first Supreme Court case to face the obscenity issue squarely was Roth v. United States, 354 U.S. 476.[1a] The majority opinion in that case established the following test: "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." Id. at 489. In a footnote the majority clarified what their notion of "prurient" was by quoting with approval Am. Law. Inst., Model Penal Code, § 207.10 (2) (Tent. draft, No. 6, 1957) which defined that term as "... a shameful or morbid interest in nudity, sex, or excretion."[2]Roth v. United States, supra, at 487, n. 20.
We have no doubt that the dominant theme of Memoirs appeals to prurient interest. The book is composed almost entirely of a series of episodes involving Lesbianism, voyeurism, prostitution, flagellation, sexual orgies, masturbation, fellatio, homosexuality, and defloration, all of which "goes substantially beyond customary limits of candor in describing or representing such matters." Am. Law Inst., Model Penal Code, § 251.4 (1) (Proposed Official Draft, May 4, 1962). See Jacobellis v. Ohio, 378 U.S. 184, 191. For the same reason, we hold Memoirs to be such an affront *72 to current community standards as to constitute "patent offensiveness." See Manual Enterprises, Inc. v. Day, 370 U.S. 478, 482. We would reach this result whether we applied local community or national standards. See Jacobellis v. Ohio, supra, at 193 (opinion of Brennan, J.), which indicates national standards should be used. But see dissent of Warren, C.J., in that case at page 200, which takes the position that obscenity is to be defined by local community standards.
There is one other possible test which must be considered. The majority opinion in the Roth case went on to say that "implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance" (emphasis supplied) Id. at p. 484. While it does not clearly emerge from the opinion whether "social importance" is an independent standard, subsequent decisions shed some light on the matter.
In Jacobellis v. Ohio, supra, 191 (opinion of Brennan, J., concurred in by Goldberg, J.), the view was expressed that the constitutional status of material cannot "be made to turn on a `weighing' of its social importance against its prurient appeal, for a work cannot be proscribed unless it is `utterly' without social importance." See Tralins v. Gerstein, 378 U.S. 576 (per curiam), and Grove Press, Inc. v. Gerstein, 378 U.S. 577 (per curiam). Thus it would appear that unless a work is "utterly without social importance" it cannot be deemed obscene. For views which would extend the constitutional protection even further see Roth v. United States, 354 U.S. 476, 508 (dissent of Douglas, J.); Jacobellis v. Ohio, 378 U.S. 184, 196 (opinion of Black, J.); A Quantity of Books v. Kansas, 378 U.S. 205, 213 (opinion of Black, J.).
The trial judge, after an exhaustive and able discussion of the relevant decisions, ruled that the Attorney General, to maintain his petition, must meet the following three tests: "First, the `prurient interest' test, which, because of the holding in the `Tropic of Cancer' (345 Mass. 11) case must be shown to be `hard core pornography'; Second, the *73 `patent offensiveness' test; and Third, the `social value' test." He further ruled that the "[f]ailure ... to sustain the standards that any one of these tests is designed for will result in an adjudication that the book ... [is not] obscene in a constitutional sense." Whether the Supreme Court of the United States has laid down three independent standards, all of which (as the judge ruled), must be satisfied, need not be decided, for in our opinion Memoirs meets all the tests.[1b] As indicated above, we have little doubt that Memoirs' dominant theme appeals to prurient interests and that it is patently offensive.
It remains to consider whether the book can be said to be "utterly without social importance." We are mindful that there was expert testimony, much of which was strained, to the effect that Memoirs is a structural novel with literary merit; that the book displays a skill in characterization and a gift for comedy; that it plays a part in the history of the development of the English novel; and that it contains a moral, namely, that sex with love is superior to sex in a brothel. But the fact that the testimony may indicate this book has some minimal literary value does not mean it is of any social importance. We do not interpret the "social importance" test as requiring that a book which appeals to prurient interest and is patently offensive must be unqualifiedly worthless before it can be deemed obscene. Upon a consideration of all the evidence, including the book, we are of opinion that Memoirs is not endowed with constitutional protection.
We have not overlooked the fact that Memoirs was recently held not to be obscene in the constitutional sense by a closely divided court in Larkin v. G.P. Putnam's Sons, 14 N.Y.2d 399. But the Superior Court of New Jersey in a well considered opinion has reached a contrary conclusion with respect to this book in G.P. Putnam's Sons v. *74 Calissi, 86 N.J. Super. 82. We find the reasoning in that decision and the opinions of the dissenting judges in the Larkin case more persuasive.
It follows that the entry must be
Decree affirmed.
WHITTEMORE, J. (dissenting, with whom Spiegel, J., joins)
This book cannot be ruled to be "utterly without redeeming social importance." Roth v. United States, 354 U.S. 476, 484. Jacobellis v. Ohio, 378 U.S. 184, 191.
In the view of one or another or all of the following viz., the chairman of the English department at Williams College, a professor of English at Harvard College, an associate professor of English literature at Boston University, an associate professor of English at Massachusetts Institute of Technology, and an assistant professor of English and American literature at Brandeis University, the book is a minor "work of art" having "literary merit" and "historical value" and containing a good deal of "deliberate, calculated comedy." It is a piece of "social history of interest to anyone who is interested in fiction as a way of understanding society in the past."[1] A saving grace is that although many scenes, if translated into the present day language of "the realistic, naturalistic novel, could be quite offensive" these scenes are not described in such language. The book contains no dirty words and its language "functions ... to create a distance, even when the sexual *75 experiences are portrayed." The response, therefore, is a literary response. The descriptions of depravity are not obscene because "they are subordinate to an interest which is primarily literary"; Fanny's reaction to the scenes of depravity was "anger," "disgust, horror [and], indignation." The book "belongs to the history of English literature rather than the history of smut."[1a]
The book, according to its publisher, has been purchased by a considerable number of college libraries including the Harvard and Massachusetts Institute of Technology libraries.
It is not the court's function to consider whether to agree or disagree with the appraisal of the book by academic witnesses. The controlling circumstance is that the work is evaluated by representative scholars and teachers of English literature as a work of some literary and historical significance notwithstanding its patently pornographic aspects. I construe the concept embodied in the term "social importance" as used by the United States Supreme Court to include the literary and historical field. Hence, I believe that the publication of this book is protected by the First Amendment as expounded in the Supreme Court decisions. Larkin v. G.P. Putnam's Sons, 14 N.Y.2d 399.
I assume that the book would be offensive to some, perhaps a great many, readers. So are numerous other books now published that use four letter words freely, portray sexual encounters explicitly and with a detail of description far beyond anything used by Cleland, and often appear intended to degrade and debase the sexual relationship. A purpose of some such books appears to be the destruction of concepts deemed basic to the existing social and moral order. If the measure intended by the Roth case, supra, were of possible effect on prevailing values, books like "Tropic of Cancer" would, I submit, be banned. But on such a scale "Fanny Hill" appears of slight, if any, weight *76 and not worth the attention that efforts to ban inevitably bring. I agree with the opinion in the Larkin case, supra, that "[i]t is unlikely `Fanny Hill' can have any adverse effect on the sophisticated values of our century." 14 N.Y.2d 399, 403-404.
Freedom to read, as I construe it, means that such a book as this is to be available to those who wish to read it and that the persisting urge of others to bar its publication is effectively restrained. There is, of course, no obligation upon any member of the general public to read this book.
CUTTER, J. (dissenting)
I disagree with the majority opinion for reasons in part somewhat different from those stated by Mr. Justice Whittemore and Mr. Justice Spiegel.
The book seems to me offensive and unpleasant in numerous respects. In my opinion, it could reasonably be found that distribution of the book to persons under the age of eighteen would be a violation of G.L.c. 272, § 28,[1] as tending to corrupt the morals of youth. Despite the propensity of some young people to regard forbidden territory as a challenge to its exploration, it is not for the courts to determine whether it is wise to seek to prevent sale of such a book to persons under eighteen. I perceive no constitutional obstacle to treating as a criminal offence the sale of this book to persons under eighteen.[2]
*77 It is quite another thing effectually to prohibit sale of the book to all adults in Massachusetts by declaring the book to be obscene. This proceeding presents much the same substantive question involved in Butler v. Michigan, 352 U.S. 380, 382-384. There the Supreme Court of the United States held that Michigan could not prevent the sale to adults of a book which might "have a potentially deleterious influence upon youth." Michigan then argued that it was promoting the public welfare "by thus quarantining the general reading public against books not too rugged for grown men and women in order to shield juvenile innocence." Mr. Justice Frankfurter wisely said of this argument, "Surely, this is to burn the house to roast the pig.... [The] legislation [is] not reasonably restricted to the evil with which it is said to deal. The incidence of this enactment is to reduce the adult population of Michigan to reading only what is fit for children. It thereby arbitrarily curtails one of those liberties of the individual, now enshrined in the Due Process Clause of the Fourteenth Amendment, that history has attested as the indispensable conditions for the maintenance and progress of a free society." Here the effort is so to apply the provisions of c. 272, §§ 28C-28H, as amended (see also §§ 28, 28A, and 28B), as to deprive adults of the opportunity to read written material which, in the opinion of some members of the academic community, has some historical, literary, sociological, or entertainment interest. Although the book seems to me pretty sorry material, there is no accounting for tastes. It is irrelevant that the taste of those who wish to read this tawdry writing seems deplorable to judges, or to prosecutors, or to persons of conventional habits, or to volunteer guardians of the morals of other adults. Although this book appears to me to have substantially less literary excuse than the book discussed in Attorney Gen. v. "Tropic of Cancer," 345 Mass. 11, it cannot be said to be "utterly without redeeming social importance." As I read the recent United States decisions, they declare in effect (if not in words) that to justify literary censorship there must *78 be absent any form of worth. See Jacobellis v. Ohio, 378 U.S. 184, 191-192.
I would (a) limit the relief granted to a declaration that distribution of this book to persons under the age of eighteen may be found to constitute a violation of c. 272, § 28, if that section is reasonably applied, and (b) expressly declare that, in view of the First Amendment, the book cannot be adjudged "obscene" in the sense in which that term has been used in recent constitutional decisions of the Supreme Court of the United States.
NOTES
[1] Section 28C reads, in relevant part, "Whenever there is reasonable cause to believe that a book which is being imported, sold, loaned or distributed ... is obscene, indecent or impure, the attorney general ... shall bring an information or petition in equity ... directed against said book by name." Then follows a provision relating to a "reasonable cause" hearing, notice to interested persons, and an interlocutory adjudication. Section 28E provides for an adjudication against the book, in the event of default, "if the court finds that the book is obscene, indecent or impure...." Section 28F provides for a contested hearing. "At such hearing the court may receive the testimony of experts and may receive evidence as to the literary, cultural or educational character of said book and as to the manner and form of its publication, advertisement, and distribution."
[1a] This case, as well as all but the most recent authority, is fully discussed in Attorney Gen. v. "Tropic of Cancer," 345 Mass. 11. We need not, therefore, elaborate upon the general development of this area of the law.
[2] The same definition of "prurient" has been adopted by Am. Law. Inst., Model Penal Code, § 251.4 (1) (Proposed Official Draft, May 4, 1962).
[1b] A fourth criterion, which involves determining whether material is hard core pornography, has been suggested. See Jacobellis v. Ohio, supra, pp. 184, 197 (opinion of Stewart, J.); Attorney Gen. v. "Tropic of Cancer," 345 Mass. 11, 19. But the Supreme Court has never so held.
[1] One of the witnesses testified in part as follows: "Cleland is part of what I should call this cultural battle that is going on in the 18th century, a battle between a restricted Puritan, moralistic ethic that attempts to suppress freedom of the spirit, freedom of the flesh, and this element is competing with a freer attitude towards life, a more generous attitude towards life, a more wholesome attitude towards life, and this very attitude that is manifested in Fielding's great novel `Tom Jones' is also evident in Cleland's novel.... [Richardson's] `Pamela' is the story of a young country girl; [his] `Clarissa' is the story of a woman trapped in a house of prostitution. Obviously, then, Cleland takes both these themes, the country girl, her initiation into life and into experience, and the story of a woman in a house of prostitution, and what he simply does is to take the situation and reverse the moral standards. Richardson believed that chastity was the most important thing in the world; Cleland and Fielding obviously did not and thought there were more important significant moral values."
[1a] In the opinion of the other academic witness, the headmaster of a private school, whose field is English literature, the book is without literary merit and is obscene, impure, hard core pornography, and is patently offensive.
[1] Section 28 (as amended through St. 1959, c. 492, § 1), reads in part as follows: "Whoever sells or ... publishes for the purpose of selling or distributing, to a person under the age of eighteen years a book ... which is obscene ... or manifestly tends to corrupt the morals of youth ... shall be punished by imprisonment in the state prison for not more than five years or in a jail or house of correction for not more than two and one half years, or by a fine of not ... more than five thousand dollars, or by both such fine and imprisonment in jail or the house of correction. In order to obtain a conviction under this section, it shall not be necessary to prove that the book ... has been adjudged to be obscene ... under the provisions of" §§ 28C to 28H.
[2] This, as a practical matter, might cause some booksellers to refuse to sell the book to persons recognizable as minors and to be somewhat cautious about its distribution. See Lockhart and McClure, Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn. L. Rev. 5, 84-87. Although no declaration was expressly sought that sale of the book might be a violation of § 28, a determination that the book may not be sold to certain minors is a lesser form of relief which may be reasonably regarded as included in the greater equitable relief asked for under § 28C.