ATTORNEY GENERAL vs. A BOOK NAMED "NAKED LUNCH."

Suffolk.    October 8, 1965. — July 7, 1966.

Present: SPALDING, WHITTEMORE, CUTTER, KIRK, SPIEGEL,
& REARDON, JJ.

*Obscenity. Book. Constitutional Law,* Freedom of speech, Freedom of the press.

In a proceeding under G. L. c. 272, §§ 28C et seq., against the book entitled "Naked Lunch," the book could not be said to be utterly without redeeming social value, and so was protected by the First Amendment of the Federal Constitution from being adjudged "obscene," where the record showed that a substantial and intelligent group in the community believed it to have some literary worth and did not show that it had been commercially exploited on the basis of its prurient appeal; but a decree in favor of the book ordered by this court to be entered was to be without prejudice to a new proceeding grounded on any such exploitation after the date of certain decisions of the Supreme Court of the United States dealing with that ground; KIRK, J., dissenting; REARDON, J., dissenting.

PETITION filed in the Superior Court on September 17, 1964.

The case was heard by *Hudson,* J.

*Edward De Grazia* of the District of Columbia (*Daniel Klubock* with him) for the intervener Grove Press, Inc.

*William I. Cowin,* Assistant Attorney General, for the Attorney General.

BY THE COURT.   The book was adjudged obscene in the Superior Court.   G. L. c. 272, §§ 28C, 28E, 28F (each inserted by St. 1945, c. 278, § 1).   The Supreme Court of the United States has held that, to justify a holding of obscenity, "three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards . . . and (c) the material is *utterly* without redeeming social value" (emphasis supplied).   *A Book Named "John Cleland's Memoirs of a Woman of Pleasure"* v. *Attorney Gen. of Mass.* 383 U. S. 413, 418–421 (hereafter referred to as the *Memoirs* case).   "Naked Lunch" may appeal to the prurient interest of deviants and those curious about deviants.   To us, it is grossly offensive and is what the author himself says, "brutal, obscene and disgusting."

As to whether the book has any redeeming social value, the record contains many reviews and articles in literary and other publications discussing seriously this controversial book portraying the hallucinations of a drug addict. Thus it appears that a substantial and intelligent group in the community believes the book to be of some literary significance.   Although we are not bound by the opinions of others concerning the book, we cannot ignore the serious acceptance of it by so many persons in the literary community.   Hence, we cannot say that "Naked Lunch" has no "redeeming social importance in the hands of those who publish or distribute it on the basis of that value."   See the *Memoirs* case at p. 421.

The record does not show that the book has been "commercially exploited for the sake of prurient appeal, to the exclusion of all other values."   The question, therefore, is

not presented whether the book, or its publication and distribution, are on that account "utterly without redeeming social importance." See the *Memoirs* case at pp. 420–421, which appears to treat the privilege under the First Amendment of publishing material like this as a qualified privilege which may be lost if abused. See also *Ginzburg* v. *United States,* 383 U. S. 463, 467–476; *Mishkin* v. *New York,* 383 U. S. 502, 508–512. Cf. *Galvin* v. *New York, N. H. & H. R.R.* 341 Mass. 293, 296–298.

The final decree is reversed and a new final decree is to be entered declaring that (without considering whether the book has been commercially exploited for the sake of prurient appeal) the book cannot be declared to be obscene. This new final decree shall be without prejudice to the bringing of new proceedings with respect to this book under the appropriate sections of G. L. c. 272, if it shall appear that, after March 21, 1966, the date of the three recent Supreme Court cases, already cited, any persons have been or are advertising or distributing this book in this Commonwealth in a manner to exploit it for the sake of its possible prurient appeal.

*So ordered.*

The Chief Justice took no part in the consideration of this case.

REARDON, J. (dissenting) I respectfully dissent from the opinion of the majority. Some general observations are in order as a preface to a statement of my reasons.

1. It is appropriate to note that, since the adoption of the Constitution of Massachusetts in 1780, this court and its judges have been most aware of the responsibility laid upon them by art. 16, Part I, of the Declaration of Rights which provides: "The liberty of the press is essential to the security of freedom in a state: it ought not, therefore, to be restrained in this commonwealth." It was Massachusetts which, in ratifying the Constitution of the United States in 1788, first among the States called for the addi-

tion of a Bill of Rights. This call echoed by other ratifying conventions led in December, 1791, to the adoption of the first and the nine succeeding amendments to the Constitution of the United States.[1] Thus our disinclination to serve as a censor of published material has an historical constitutional foundation which antedates that of any other American tribunal.

One need not agree with the view of Mr. Justice Black that "the Federal Government is without any power whatever under the Constitution to put any type of burden on speech and expression of ideas of any kind," *Ginzburg* v. *United States,* 383 U. S. 463, 476, to be able to agree with him that the lot of the judge who is charged with deciding cases such as this would be immeasurably eased were Mr. Justice Black's view that of the majority of his court.[2] But such is not the fact and we find ourselves again confronted with the troublesome problem of applying G. L. c. 272, §§ 28C-28G.

The task of the appellate judge on the State court in dealing with an allegedly pornographic work is not a happy one in these days. He may personally be of the opinion, also held by some who have written on the subject of pornography, that, were all restraints on publication lifted, levels of public taste would eventually rise and the business of pornography become unprofitable.[3]

Yet we have, as was so well stated by Chief Justice Qua in *Commonwealth* v. *Isenstadt,* 318 Mass. 543, 548, the "plain but not necessarily easy duty to read the words of the statute in the sense in which they were intended, to

---

[1] Sutherland, Constitutionalism in America (1st ed. 1965), pp. 179, 180.

[2] *Ginzburg* v. *United States,* 383 U. S. 463, 477–481 (dissent). *Mishkin* v. *New York,* 383 U. S. 502, 515–518 (dissent). Cahn, Justice Black and First Amendment ''Absolutes'': A Public Interview, 37 N. Y. U. L. Rev. 549, 553–554, 559. Justice Brennan, The Supreme Court and the Meiklejohn Interpretation of the First Amendment, 79 Harv. L. Rev. 1, 4–5, 14. Reich, Mr. Justice Black and the Living Constitution, 76 Harv. L. Rev. 673, 695–697, 713, 735, 738–739. See Harlan, J., dissenting in *A Book Named ''John Cleland's Memoirs of a Woman of Pleasure''* v. *Attorney Gen. of Mass.* 383 U. S. 413, 459–460.

[3] Levin, Refractions: Essays in Comparative Literature (1966), p. 307; also printed in part in the Atlantic of February, 1966, under the title, ''The Unbanning of the Books.''

accept and enforce the public policy of the Commonwealth as disclosed by its policymaking body, whatever our own personal opinions may be, and to avoid judicial legislation in the guise of new constructions to meet real or supposed new popular viewpoints, preserving always to the Legislature alone its proper prerogative of adjusting the statutes to changed conditions." In construing the present statute we are given added guidance by *A Book Named "John Cleland's Memoirs of a Woman of Pleasure"* v. *Attorney Gen. of Mass.* 383 U. S. 413, 413–462 (hereafter *Memoirs*), decided since this case was argued before us. The majority opinion in that case set forth G. L. c. 272, §§ 28B–28F, inclusive, in full in an appendix without comment. It is reasonable to conclude that the Supreme Court of the United States acknowledges authority in those sections of that statute, subject to their application within the guidelines which the majority in the *Memoirs* case laid down.[4]

It is thus my view that there is still power resident in the statute and I believe that the Commonwealth is entitled to have this court enforce what power it still contains. Failure to do so in this case consigns our State law in this field to a limbo and is, in fact, a contravention of the will of the Legislature on the supposed basis that the statute has been overridden by the *Memoirs* case. I do not so read that case.

2. Consonant with the duty laid upon us by the statute, I have read the book and found it to be a revolting miasma of unrelieved perversion and disease, graphically described in the findings of the trial judge. It is, in truth, literary sewage. Before the trial judge a number of authors and academic witnesses, as well as several psychiatrists, on behalf of the interveners gave varying testimony regarding the social and literary worth of the book and engaged in efforts to interpret its title. Despite the testimony of these witnesses, the trial judge, on the basis of a national stand-

---

[4] But see footnotes 4 and 5 in *Memoirs, supra,* p. 417, intimating that G. L. c. 272, § 28H, may be constitutionally infirm. See also c. 272, § 28G. See in this regard the following cases in the Supreme Court of the United States: *Redrup* v. *New York* and *Austin* v. *Kentucky,* 386 U. S. 767.

ard, found the book to be patently offensive, "predominantly prurient, hard-core pornography, and utterly without redeeming social importance."

It has been argued by the intervener that, in assessing the social importance of the book, the judge was bound to abide by those opinions which came to him in the testimony of the witnesses whom he heard and in the reviews which were presented to him as exhibits. Indeed it was stated in a dissent in *Attorney Gen.* v. *A Book Named "John Cleland's Memoirs of a Woman of Pleasure,"* 349 Mass. 69, 75, when that book was before us: "It is not the court's function to consider whether to agree or disagree with the appraisal of the book by academic witnesses. The controlling circumstance is that the work is evaluated by representative scholars and teachers of English literature as a work of some literary and historical significance notwithstanding its patently pornographic aspects." And in the majority opinion in the case at bar, it is said, on "whether the book has any redeeming social value, the record contains many reviews and articles in literary and other publications discussing seriously this controversial book portraying the hallucinations of a drug addict. Thus it appears that a substantial and intelligent group in the community believes the book to be of some literary significance. Although we are not bound by the opinions of others concerning the book, we cannot ignore the serious acceptance of it by so many persons in the literary community. Hence, we cannot say that 'Naked Lunch' has no 'redeeming social importance in the hands of those who publish or distribute it on the basis of that value.' "

I cannot associate myself with this view. Our experience with allegedly pornographic works over the years here in Massachusetts has revealed that there is no dearth of experts ready to leap to the defence of such of them as have come under scrutiny from time to time.[5] As one looks back

---

[5] *Attorney Gen.* v. *The Book Named "Forever Amber,"* 323 Mass. 302, 308–309. *Attorney Gen.* v. *The Book Named "God's Little Acre,"* 326 Mass. 281, 284. In *Attorney Gen.* v. *A Book Named "John Cleland's Memoirs of a Woman of Pleasure,"* 349 Mass. 69, 73, the majority said, "We are mindful

now on publications which have been considered in other years, it is plain to see that much material there defended was shoddy stuff on any standard.   Much indeed depends upon the identity and quality of the witnesses and the substance of their testimony but the mere appearance of such witnesses does not compel the trial judge or us to surrender the power of judgment into their hands.[6]   Surely the finding of fact by a trial judge seasoned by years of experience in dealing with social values and their implementation, as well as social ills and their remedies under the law, is entitled to more weight before us than are the opinions of the witnesses who were before him, whom he saw, and whom he heard render judgments which became weak indeed under examination as the record well demonstrates.[7]

---

that there was expert testimony, much of which was strained . . . .'' See *Commonwealth* v. *Isenstadt*, 318 Mass. 543, 556, 558–559; *Attorney Gen.* v. *The Book Named "Serenade,"* 326 Mass. 324, 326; *Attorney Gen.* v. *The Book Named "Tropic of Cancer,"* 345 Mass. 11, 13, 20.   For a summary of Massachusetts cases, including older cases, see Note, Book Censorship in Massachusetts: The Search for a Test for Obscenity, 42 B. U. L. Rev. 476, 479–491.

[6] It has not yet been suggested by a majority of the Supreme Court of the United States that, when an ''expert'' witness approves a book, the trial judge is foreclosed from finding it without redeeming social value.   However, Mr. Justice Douglas in his concurrence in *Memoirs*, 383 U. S. 413, 427, said: ''We are judges, not literary experts or historians or philosophers.  We are not competent to render an independent judgment as to the worth of this or any other book, except in our capacity as private citizens. . . .   On this record [described as containing 'considerable and impressive testimony to the effect that this was a work of literary, historical, and social importance'], the Court has no choice but to reverse the judgment of the Massachusetts Supreme Judicial Court . . . .''   But see the dissent by Clark, J., in *Memoirs*, 383 U. S. 413, 448–450, examining the experts' opinions, concluding, ''In my view this proves nothing as to social value.  The state court properly gave such testimony no probative weight,'' and saying, ''It only indicates the lengths to which these experts go in their effort to give the book some semblance of value'' and, the court ''can accept the appraisal of experts or discount their testimony in the light of the material itself or other relevant testimony.''   In the same vein, see Harlan, J., dissenting in *Memoirs*, 383 U. S. 413, 460: ''The views of literary or other experts could be made controlling, but those experts had their say in 'Fanny Hill' and apparently the majority is no more willing than I to say that Massachusetts must abide by their verdict.''

[7] (1) John Ciardi, poet: A. ''I should like to make one point, especially since there's been introduced in evidence . . . a piece of my writing on Naked Lunch.  At that time I was reviewing ten excerpts and I was rather enthusiastic about . . . these excerpts.  My later opinion, when I read the whole book, is that the structure is a little soggy and slow.''   Q. ''May I ask you to interpret what this paragraph is about?''   A. ''I doubt that Burroughs himself could interpret what this paragraph was about.''   Q. ''Mr. Ciardi, would you say that the book invokes a response that was primarily

Attorney General *v.* "Naked Lunch."

What has been said relative to the witnesses who were heard may also be said of reviews discussing this work, some of which are in the record. Not all of them were favorable. A number of them were concerned principally with the question whether "Naked Lunch" was more calculated to produce titillation or nausea. One of them stated that "the book is as obscene as anything ever written.[8] Only two of these reviewers were before the trial judge. Names were appended to the reviews but no matter how extensive the reputations of the absent reviewers there was no opportunity to cross-examine them regarding their respective comments. Here again, relative to the reviews, it is my belief that this court should not abdicate its responsibility.

literary?'' A. "I believe so . . . . In the first place, I think the nature of the writing is such that unless one is interested in whatever literary phenomenon this is, he is going to be bored and quit.'' Q. "Would deletion of a number of references to homosexuality reduce the literary effect?'' A. "I think that is a matter on which only the author is competent in himself and this is a nightmarish book, full of fantasies, drug hallucinations.'' Q. "May I ask what the references [to homosexuality] contribute to the major theme of the book?'' A. "To me they contribute a certain boredom with Burroughs' method. I think he is more interested in this sort of detail than I am; and those are the sort of pages I shrug and keep on going.''

(2) Norman Mailer, novelist: Q. "Considering the difficulty of the work and your relatively indirect exposures to it, may I ask, Mr. Mailer, how you are so sure of the value that this book contains?'' A. ". . . I can't give a final word on how good it is without reading it five or six times. I think it has extraordinary merit and may be a great novel. . . . I suspect it has a very elaborate structure. I cannot say for a certainty. I think it is so because I couldn't draw it for you. . . . If I were to read it three or four times I could probably decide to my satisfaction how good the structure was, where perfect, where imperfect.'' Q. The court: ". . . [D]o you think the average book lover reads a book . . . more than once?'' A. "No. . . . I also feel I would now be prepared to say . . . there is a structure to it. I am not prepared to say how fine it is artistically.''

(3) Professor Thomas H. Jackson, Massachusetts Institute of Technology: Q. "Are there details and points in this book that you feel you may not be able to explain because, in effect, they have no meaning and are intended only for shock value?'' A. "Actually, no.'' Q. "Everything in this book has meaning then?'' A. "*As a literary man I have to assume it does, yes*'' (emphasis supplied).

(4) Allen Ginsberg, poet: A. ". . . [The title, Naked Lunch] relates to nakedness of seeing, to be able to see clearly without any confusing disguises, to see through the disguise. . . . 'Naked,' in the title; and 'Lunch' would be a complete banquet of all this naked awareness. . . . I think here he is referring to the whole book as Bill Burrough's Naked Lunch Room, a lunch room . . . .''

[8] Note, "Strange Taste," Newsweek (November 26, 1962).

I conclude, therefore, that in the case on appeal of a suit brought by the Attorney General under G. L. c. 272, § 28C, the findings of the trial judge are entitled to more weight than has been accorded to them by the majority opinion.[9]

3. In the majority opinion there is a concession that the book "may appeal to the prurient interest of deviants and those curious about deviants." It calls the book "grossly offensive" and concurs with what the author himself said about it, that it is "brutal, obscene, and disgusting."[10] Having stated that it cannot be said that the book has no redeeming social importance, the opinion goes on to say that the record fails to show a commercial exploitation for the "sake of prurient appeal, to the exclusion of all other values" and states that the question is not presented whether "the book, or its publication and distribution, are on that account 'utterly without redeeming social importance.' "

The majority, unmindful of the order of events, hold that the absence of evidence of commercial exploitation in this record requires a reversal of the trial court, and note that in the *Memoirs* case Mr. Justice Brennan said that evidence of such commercial exploitation might justify the conclusion that the book was utterly without redeeming social importance.

The trial judge filed his findings of material facts and order for decree on March 23, 1965. A final decree was entered and the intervener appealed on March 25, 1965. Argument was heard before us on October 8, 1965, and we have since had the case under consideration awaiting clarification of the law from the Supreme Court of the United States. On December 7 and 8, 1965, the Supreme Court of the United States heard oral argument on the *Memoirs* case, *Ginzburg* v. *United States,* and *Mishkin* v. *New York.* On March 21, 1966, the Justices of the Supreme Court of the

---

[9] General Laws, c. 272, § 28F, says, "Such hearing shall be conducted in accordance with the usual course of proceedings in equity including all rights of exception and appeal."

[10] Naked Lunch, by William Burroughs, Grove Press (1959), Introduction, p. xii.

United States handed down their opinions in these three cases.[11] The law regarding obscenity, in the light of which both *Attorney Gen.* v. *A Book Named "John Cleland's Memoirs of a Woman of Pleasure,"* 349 Mass. 69, and the instant case had been earlier decided, was thus redefined, the facet of commercial exploitation being added to the test of obscenity established in *Roth* v. *United States,* 354 U. S. 476, 484, 487.[12] This additional facet naturally was not explored in the hearings in this case before the trial judge. In my view, before a final decision is made by this court, it should be.

In *Rosenblatt* v. *Baer,* 383 U. S. 75, 87–88, the Supreme Court of the United States noted that its decision in *New York Times Co.* v. *Sullivan,* 376 U. S. 254, had intervened between the *Rosenblatt* trial and the decision on the appeal, and that the *New York Times* decision bore directly on the applicable law and upon Baer's failure to adduce certain evidence in addition to that which he had adduced. On this ground the Supreme Court of the United States remanded the matter to the State court for further proceedings. In other words, there was redefinition of the law while the case was on appeal. The Supreme Court recognized this and remanded. We should do no less.

It is my belief that the Attorney General did not waive the right of the Commonwealth to raise the newly announced issue of commercial exploitation by not presenting such evidence in the court below. I cannot agree with any inference in the majority opinion that such a waiver has occurred. It might be argued that one reason for applying

---

[11] 383 U. S. 413–518.

[12] The law is now "rewritten," Black, J., dissenting, and "quite different," Harlan, J., dissenting, both in *Ginzburg* v. *United States,* 383 U. S. 463, 477, 494–495. See *Attorney Gen.* v. *A Book Named "Forever Amber,"* 323 Mass. 302, 308, where this court summarized the content of the advertisements and then said, "The advertisements, however, are not part of the novel, which in final analysis must meet the test of the statute upon what is contained within its own covers." See also Lockhart & McClure, Literature, The Law of Obscenity and the Constitution, 38 Minn. L. Rev. 295, 338–350, 394–395; Lockhart & McClure, Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn. L. Rev. 5, 68–70, 77–88.

the doctrine of waiver to affirm or reverse on the basis of a trial court judgment despite a change or further elaboration in the law during the taking of the appeal is to prevent the occurrence of excessive delay and expense for litigants and other interested parties, but "[b]alanced against this policy of efficiency in the judicial process is the objective of settling disputes correctly in light of existing law . . . ." Note, Waiver: Limitation on Intervening-Change-in-the-Law Exception, 18 Stanford L. Rev. 718, 719.[13]

There is much more to be said for a remand of this case for the taking of further evidence than for a reversal. A reversal, as the majority opinion points out, does not necessarily end all action on the book nor does it provide a salutary precedent for later cases brought under the statute. The Attorney General is free to begin again. To remand the matter for a hearing on advertising would eliminate the likelihood of a complete retrial on all points in the event that the Attorney General desires to take new action in the light of the *Memoirs* decision.[14] There appears to be no question in the minds of the majority in this case or the majority of the Supreme Court of the United States in the *Memoirs* case that litigation of this new issue of the manner of commercial presentation could change the result. The record indicates the possibility of proof by the Commonwealth on remand that "exploitation for the sake of prurient appeal" has occurred. It will be remembered that the author himself, who presumably wrote his book for sale, termed it "obscene" in his foreword. In addition, exhibit 20, the New York Times Book Review section of January 10, 1965, which was before the trial judge, contains an

---

[13] See *Recent Decisions*, 27 Va. L. Rev. 826, 827. "Apparently the basis for the ruling in these exceptional situations . . . is that the courts will take cognizance of a changed situation and will give effect to a matter bearing directly upon the right disposition of the case in order to prevent a miscarriage of justice," citing *Gulf, Colo. & Santa Fe Ry.* v. *Dennis,* 224 U. S. 503, 507. Note, *Erie R.R.* v. *Tompkins* and Supervening Changes in State Law, 50 Yale L. J. 315, 317, n. 14, listing Federal cases.

[14] See *Cambria* v. *Jeffery,* 307 Mass. 49, 50; *Henchey* v. *Cox,* 348 Mass. 742, 746–747; James, Civil Procedure (1965), §§ 11.17 and 11.18.

advertisement in which this work is offered in tandem with another book which was titled "Ananga Ranga 'The Oriental Art of Love,' " for sale at a price for both of $7.95 plus a mailing charge.[15]  The books are advertised as "Not for minors — for adults only," and "Naked Lunch . . . Exactly as printed in Paris by the Olympia Press," is called "a literary masterpiece by some, a piece of pornography by others . . . Shocking! Startling! . . . Definitely not for the squeamish . . . A searing experience." This language strongly suggests an endeavor to induce purchase through the very type of appeal which was alluded to by Mr. Justice Brennan in his discussion of commercial exploitation in the *Memoirs* case.[16]

Other jurisdictions recognize that a change in the law during the pendency of an appeal may require a rehearing of the cases affected.[17]  There is no sound reason why the policy of ordering a rehearing should not apply here in favor of the Commonwealth which has spoken in the statute and with a voice we are bound to heed in applying it. Massachusetts precedent exists to the effect that this court will notice changes in the law intervening between trial and decision upon appeal.  In *Pilgrim* v. *MacGibbon*, 313 Mass. 290, 298, where the judge had entered verdicts for the defendants after a jury had found for the plaintiff, we were asked to consider the effect of a Nova Scotia case, decided

---

[15] "From the reported evidence we may make additional findings not made by the trial judge. *Lowell Bar Association* v. *Loeb*, 315 Mass. 176, 178. And with respect to the advertising . . . we have done so." *Attorney Gen.* v. *The Book Named "Forever Amber*," 323 Mass. 302, 309.

[16] See *Books, Inc.* v. *United States of America,* 358 F. 2d 935, 937–939 (1st Cir.).

[17] *Gulf, Colo. & Santa Fe Ry.* v. *Dennis,* 224 U. S. 503, 506–507. *Blair* v. *Commissioner of Int. Rev.* 300 U. S. 5, 8–9. *Hormel* v. *Helvering, Commr. of Int. Rev.* 312 U. S. 552, 559–560. *Yates* v. *St. Johns Beach Dev. Co.* 122 Fla. 141, 143–144. *Grist* v. *Upjohn Co.* 362 Mich. 470, 472. *Simmons* v. *State,* 199 Miss. 271, 275. *Lee* v. *Junkans,* 18 Wis. 2d 56, 66–67. Note, Reformulation of the Rule against Introducing New Matter in Appellate Courts — the Hormel Case, 50 Yale L. J. 1460, 1461. It was there said, "Despite the rule, however, there have been many exceptional cases where new matter has been considered on appeal. . . . Other recognized exceptions are supervening decisions on matters raised below[6] . . . ." (Footnote No. 6 read, "This applies to state and federal court decisions alike.")  See *Heritage Mut. Ins. Co.* v. *Sheboygan County,* 18 Wis. 2d 166, 171–172.

after the trial, which clarified the standard of gross negligence in the governing Nova Scotia statute. The law had not changed with regard to relevant evidence; rather the standard to be applied to facts already in evidence had been reformulated in Nova Scotia where the cause of action arose. In the light of the reformulation we considered the evidence and ordered judgments for the plaintiff on the verdicts of the jury, saying, "We think it is apparent that the trial judge did not have the benefit of the decision in the . . . [intervening] case. Nevertheless, it must be held to govern the rights of the parties . . ." (p. 298).

Furthermore, even in the absence of a change in the applicable law, there is a strong public policy in this Commonwealth for remanding causes for the taking of supplementary evidence where the ends of justice will thus be best served. Examples are not wanting. "Where the facts on which the rights of the parties depend have not been ascertained at the trial it is within the power of the court in its discretion and of its own motion, to recommit the case for retrial." *Comstock* v. *Soule,* 303 Mass. 153, 159. See *New England Cement Gun Co.* v. *McGivern,* 218 Mass. 198, 205; *Rubenstein* v. *Lottow,* 220 Mass. 156, 164; *Rioux* v. *Cronin,* 222 Mass. 131, 133. "We are aided in reaching this result because it is apparent . . . that findings relative to . . . [the issue] could have been made." *Watkins* v. *Simplex Time Recorder Co.* 316 Mass. 217, 225. *Minot* v. *Minot,* 319 Mass. 253, 258–260. *Smith* v. *Commonwealth,* 331 Mass. 585, 593–594, and cases cited. *American Employers' Ins. Co.* v. *Cohen,* 334 Mass. 417, 421, and cases cited. *Frank* v. *Frank,* 335 Mass. 130, 136–137.

4. Finally, I cannot agree with the majority in their view that if any future proceedings are launched against the book evidence against it relative to the manner in which it was advertised and sold is to be limited to such promotional activity as has occurred since March 21, 1966, the date on which the three recent cases in the Supreme Court of the United States came down. That court itself imposed no such limitation in the *Memoirs* case nor in upholding the

conviction of Ginzburg. The establishment by this court of such a dividing line is a curious application of the *Memoirs* case holding. If we seek an answer to the nature of the book, how it was advertised prior to the magic date is equally pertinent to that determination as the manner in which it has been advertised since.

5. In sum, it is my view that this book should not be allowed to slide by the statutory prohibitions on the grounds set forth in the majority opinion. We should not cease in our endeavor to uphold our own statute when it still possesses some vitality. In the light of the findings of the trial judge and the foregoing discussion I would remand this matter to the Superior Court for the limited purpose of taking evidence on the manner in which this book was produced, publicized, and sold.

KIRK, J. I agree with the characterization of the book by the judge, the majority and by Mr. Justice Reardon in his dissent. I join in the dissent in so far as it rejects the proposition that a trial judge must treat the opinion of a witness in this or any proceeding as valid, binding or decisive of the case. Acceptance of the proposition is a surrender of the judicial function to absolutism.