**UNITED STATES of America**

v.

**Samuel BOLTANSKY et al.**

**Crim. A. No. 28935.**

United States District Court,
D. Maryland.

July 26, 1972.

George Beall, U. S. Atty., and Alan B. Lipson and Charles G. Bernstein, Asst. U. S. Attys., for the United States.

Robert Eugene Smith, Towson, Md., for all defendants.

Sheldon H. Braiterman, Baltimore, Md., for defendant, Samuel Boltansky.

WATKINS, District Judge.

Defendants are charged in an eighteen count indictment, Counts 1–4 charging them with knowingly causing the mails to be used for the mailing and carrying in the mails, and knowingly causing to be delivered by mail in interstate commerce "certain obscene, lewd, lascivious, indecent, filthy and vile books and publications . . . which books and publications were nonmailable matter under the provisions of Title 18 United States Code, Section 1461." Counts 5–14 charged the knowing use of an express company and common carrier, in violation of Section 1462 of Title 18; and Counts 15–18 charged transportation in interstate commerce, in violation of Section 1465 of Title 18.

Each count contained the names of one to four publications. There was some repetition, but a total of thirty different publications is involved in the indictment.

After pleas of not guilty by all defendants, the case proceeded to trial before this Judge without a jury.

The Government offered in evidence the following eighteen publications:

Yum Yum
Honeymooners No. 1
Party Pair
Double Pleasure
Love Birds
Partners No. 2
Lovers No. 2
Partners
Kozy Kids
Kings & Queens
Warm Up
Wild n Sassy
Gay Mood
Two Much
Up Tight
Busy Body
Touch & Go
Yum Yum No. 2

The Government also offered the testimony of a psychiatrist in an endeavor to establish that the dominant theme of the material taken as a whole appeals to a prurient interest in sex and that it affronts contemporary community standards; and of a journalist, art critic and author in an endeavor to show that the material had "no social value".

At the end of the Government's case, defendants' Motion to Dismiss was granted as to defendant Tapper, but denied as to the other three defendants.

Defendants offered the testimony of a psychologist that the material in question might appeal to the sick and morbid, constituting about two per cent of the population, but that to the remainder, while it might appeal to curiosity and be regarded as a novelty, after even two to four hours in a whole life time it would become boring, and would not affect normal life. After examination of the Government's exhibits, he unqualifiedly expressed the opinion that they did not have a dominant appeal to the prurient interest in sex. They would appeal to normal sexual and erotic curiosity to those who have not become sufficiently exposed to be bored, but after seeing and becoming sated, they would not want to see it again; it would not serve to "rekindle" them.

Another psychologist called by defendant expressed the opinion that the Government's exhibits were not designed to appeal to a prurient interest but to a sexual interest; they were designed to produce erotic feelings in a person who desired to be aroused. From his rather extended experience with patients, he believed the exhibits would cause a person to react as he desired and planned to react, before seeing the material, using it as he desired, motivated by his needs. He further referred to the humorous or ludicrous aspects of some of the pictures.

The third witness offered by the defendants had a M.A. degree in psychology. His experience was gained through seven months' field work for the President's Commission on Pornography and Obscenity, conducting a "study to determine the responses of a representative metropolitan center to erotica", and the making of three "mood" inventories.

A random mailing from the Detroit telephone book yellow pages elicited only one response, as to which a follow-up was ineffective. However, a number of "subjects" were obtained by a rather sensational newspaper article,[1] and others by offering patrons of the "adult section" of "magazine stores" $3 per half hour to view 42 slides "comparable" to the magazines offered in evidence in this case, plus 18 "hard core" slides.

Since the witness admitted that the survey was not representative of the City of Detroit nor of the State of Michigan, his testimony was not helpful to defendant or the Court.

The eighteen magazines offered in evidence in this case by the Government primarily constitute pictures of a male and female in various revealing poses and postures. One involves two females only. Seven involved are male and two females.

In Village Books, Inc. v. State's Attorney, 263 Md. 76, 282 A.2d 126 (1971)

---

1. In effect "Any one for pornography?"

Judge McWilliams described such magazines, known in the trade as "split beavers"[2] as follows:

". . . The magazines differ from each other but very little. In the main they consist of good to excellent professional photographs of nude young adults . . . There are females alone; there are male and female couples; there are trios—two females and one male . . . there are quartets—two females and two males . . . They have been photographed in a wide variety of poses, postures, positions and arrangements. Their facial expressions range from utterly blank to lewd and lively. All of the photographs have in common the conspicuous display of the genital[3] area, flaunting it in explicit and chromatic detail . . . Although some photographs suggest that sexual activity is but inches and seconds away the depiction of actual fellatio, cunnilingus, pederasty, copulation, masturbation or any other subsidiary variation of those activities has been studiously avoided . . .[4]" (263 Md. at 84–85, 282 A.2d at 131).

Were the author of this opinion at liberty to apply his own views, he would unhesitatingly hold the 18 magazines to be obscene; but for reasons to be developed he is not at liberty to do so.

The Supreme Court definition of obscenity appears in A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Massachusetts, 383 U.S. 413, 418–421, 86 S.Ct. 975, 16 L.Ed.2d 1, 977 where Mr. Justice Brennan said:

"We defined obscenity in *Roth* [Roth v. United States, 354 U.S. 476, 77 S. Ct. 1304, 1 L.Ed.2d 1498] in the following terms: '[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.' 354 U.S., at 489 [77 S.Ct. 1304, at 1311]. Under this definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value.

"The Supreme Judicial Court purported to apply the *Roth* definition of obscenity and held all three criteria satisfied. We need not consider the claim that the court erred in concluding that *Memoirs* [Attorney General v. A Book Named "John Cleland's Memoirs of a Woman of Pleasure", 349 Mass. 69, 206 N.E.2d 403] satisfied the prurient appeal and patent offensiveness criteria; for reversal is required because the court misinterpreted the social value criterion. The court applied the criterion in this passage:

'It remains to consider whether the book can be said to be "utterly without social importance." We are mindful that there was expert testimony, much of which was strained, to the effect that Memoirs is a structural novel with literary merit; that the book displays a skill in characterization and a gift for comedy; that it plays a part in the his-

---

2. "The term 'Beaver Books' we are told, connotes the prominent display of female pubic hair. To some of the exhibits counsel applied the term 'split-beaver'; any dolt could guess the connotation." (263 Md. at p. 82, 282 A.2d at p. 130, footnote 4).

3. And anal.

4. Defendants filed for identification only, a number of "hard core" magazines in which the above mentioned actions are clearly portrayed, often with "closeups." Defendants also marked for identification a magazine containing photographs of acts of bestiality. To his everlasting credit may it be said that the hog was the only participant evidencing any signs of reluctance or embarrassment.

tory of the development of the English novel; and that it contains a moral, namely, that sex with love is superior to sex in a brothel. But the fact that the testimony may indicate this book has some minimal literary value does not mean it is of any social importance. We do not interpret the "social importance" test as requiring that a book which appeals to prurient interest and is patently offensive must be unqualifiedly worthless before it can be deemed obscene.' 349 Mass., at 73, 206 N.E.2d at 406.

"The Supreme Judicial Court erred in holding that a book need not be 'unqualifiedly worthless before it can be deemed obscene.' A book cannot be proscribed unless it is found to be *utterly* without redeeming social value. This is so even though the book is found to possess the requisite prurient appeal and to be patently offensive. Each of the three federal constitutional criteria is to be applied independently; the social value of the book can neither be weighed against nor cancelled by its prurient appeal or patent offensiveness. Hence, even on the view of the court below that *Memoirs* possessed only a modicum of social value, its judgment must be reversed as being founded on an erroneous interpretation of a federal constitutional standard." (Footnotes omitted. Italics those of the Supreme Court.)

This language has always intrigued and puzzled this Judge.

Do the words "the dominant theme of the material taken as a whole appeals to prurient interest" mean that it must successfully appeal to, or only that it be intended to, or directed toward, "prurient interest."

If the former be true, then no finding of obscenity could be made until it was proved that the appeal was successful. All decisions would have to be ex post facto.

Further, the appeal, even if directed toward prurient interest, might unintentionally fail of success. Some of the postures are so ludicrous that to many they would be funny, not lewd. Further, a person interested in acrobatics or orthopedics might well be distracted from the piece de resistance. Also, the size of the target area is so great in some instances that it would probably tend to appeal to the prurient interest only of stallions or well-endowed male elephants.

Moreover, the "utterly" [5] in the requirement that the material be "utterly without redeeming social value" would seem to be tautological. If the material is without redeeming social value, it has no social value; it is completely, entirely, wholly, one hundred per cent and utterly without social value.[6]

If the material must be "utterly without redeeming social value" then the very slightest redeeming social value would prevent the material from being banned. What and how much is necessary for redemption? Would the printing of the Sermon on the Mount in the center of otherwise obscene material be redeeming social value? If not, what or how much more would be required?

"Redeeming social value" would seem to mean enough social value to "redeem" —to save, to overcome, the unsocial value of obscenity. Is this qualitative, quantitative, or both—or what. Apparently any "social value", no matter how small, is sufficient to be "redeeming"; for in *Memoirs* the Supreme Judicial Court of Massachusetts had found the book although not "unqualifiedly worth-

---

5. Whether or not italicized.

6. Perhaps Mr. Justice Brennan is accustomed to dealing with people who see no impropriety in standing beneath a "No Smoking" sign while smoking, because the sign does not read "Positively No Smoking."

Is it sufficient for a doctor to assure anxious parents that their daughter is not pregnant; or must he tell them that she is not even the teenyist, weenyist bit pregnant; or, that she is utterly non-pregnant?

less" to be of no "social importance". (383 U.S. at 419, 86 S.Ct. 975). The reply of the Supreme Court to this was that "the social value of the book can neither be weighed against nor canceled by its prurient appeal or patent offensiveness . . ." (383 U.S. at 419, 86 S.Ct. at 978; and see also footnote 7 at p. 419, 86 S.Ct. 975); and a "modicum [7] of social value" is sufficient (383 U.S. at 420, 86 S.Ct. 975).

This Judge delayed decision in this case hoping that the Supreme Court would announce concrete guide lines by which the lower courts might determine obscenity. With regard to books, this Court recognizes the problem of stating in advance what will constitute "redeeming social value". But with respect to pictures only, without any text, this Judge is confident that some workable criteria could be furnished; that the Supreme Court might sometime say: "This far mayest thou go, but no further" and describe the physical conduct thus permissible to be portrayed, or that Court might select one magazine, or several, that depicted the outer margins, and then even more helpfully, refer by name to one that exceeded these bounds.

Instead, the seeker after truth is told in case after case that the lower adverse decision is reversed on Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967). That case is completely unhelpful with respect to pictures; and only moderately helpful as to books, as no summarization is given of the contents of the books banned by the lower courts; nor does the Supreme Court point out of what the "redeeming social value" consists, or how it is, or is to be, ascertained.

This has reduced this Court to the necessity of trying to determine how pictorial representations held not obscene by the Supreme Court compare with the eighteen magazines in evidence in this Court. One starting point is Bloss v. Dykema, 398 U.S. 278, 90 S.Ct. 1727, 26 L.Ed.2d 230 (1970), reversing Dykema v. Bloss, 17 Mich.App. 318, 169 N.W.2d 367 (1969). The trial court had found that the magazines in question, and particularly editions of "Cover Girl" and "Exciting", were obscene even under Supreme Court standards. The Michigan Appellate Court agreed. The Supreme Court reversed on Redrup.

Four of the five "Cover Girl" magazines (Nos. 12, 13, 15 and 16) and two of the four "Exciting" magazines (Nos. 13 and 14) involved in Dykema were considered by this Court, en banc, in United States v. 4,400 Copies of Magazines, 276 F.Supp. 902 (1967), and while this Court found them to be clearly obscene in the ordinary sense of the word and in the legal sense, this Court correctly anticipated that they would not be held to be obscene constitutionally under Supreme Court "standards". While the eighteen magazines in evidence in this case are all in color and the pictures (including close-ups of the genitalia) are larger and in some instances more distinct, this judge believes that if "Cover Girl" and "Exciting" are not obscene, neither are the eighteen involved in this case. This conclusion is supported, if not required, by two relatively recent Supreme Court decisions.

In Burgin v. South Carolina, 404 U.S. 806, 92 S.Ct. 46, 30 L.Ed.2d 39 (1971), the Supreme Court reversed on *Redrup* the opinion of the Supreme Court of South Carolina in State v. Burgin, 255 S.C. 237, 178 S.E.2d 325 (1970). That Court on its review of the magazines Mirage, Togetherness, Fair Lady and Flesh Fantasy, adopted the language of the trial court holding the magazines to be obscene and pornographic beyond a reasonable doubt as a matter of law.

"Togetherness" is one of the magazines named in the indictment in this case, but not offered into evidence. It and "Fair Lady" and "Flesh Fantasy" are the full equivalent of the eighteen in this case (or vice versa). This Court

7. Webster's Third New International Dictionary defines "modicum" as "a small portion; a limited quantity or amount."

 

does not believe that if the three above mentioned were comingled with the eighteen in this case, without exhibit numbers, any one would be able to draw any significant distinction; they are truly fungible.[8]

In Wiener v. California, 404 U.S. 988, 92 S.Ct. 534, 30 L.Ed.2d 539 (1971), reh. den. 404 U.S. 1054, 92 S.Ct. 703, 30 L. Ed.2d 742 (1972), the Supreme Court reversed the decision of the Appellate Department of the Superior Court of the State of California, simply citing *Redrup*. The California Court, without a verbal description of the magazines in question, held them (with one exception) to be obscene under *Roth*.

One of these, held by the California Court to be obscene, is "Wild 'n Sassy", Government's Exhibit 3–N in this case. It is representative of the other seventeen in this case, as are "The Ballers" and "Psychedelic." [9]

In short, the eighteen magazines which are exhibits in this case seem indistinguishable on the ground of the questions of appeal to a prurient interest in sex, patent offensiveness affronting contemporary community standards relating to the representation of sexual matters, and "utter" lack of redeeming social value, from magazines held by the Supreme Court not to be obscene.[10]

While therefore the magazines "are clearly obscene in the ordinary sense of the word, and in the legal sense" [11] this Court is unable to hold them constitutionally obscene under the Supreme Court's interpretation of the First Amendment.

The same result was reached with apparently similar reluctance,[12] by the Maryland Court of Appeals as to certain similar magazines, including two offered in evidence in this case.[13]

The Court is constrained [14] to, and therefore does, find the Defendant Boltansky, and the two corporate defendants, not guilty.

---

8. Except perhaps that the posing of the "Four Big Bares" in Togetherness, with their kneeling posterior, anterior and lateral views, is truly funny.

9. "Psychedelic" also shows a hand vibrator, as does "Kozy Kids". Government's Exhibit 3–G herein.

10. No claim was made, and no evidence offered to show that defendants herein were directing their publications toward juveniles; that there was any assault upon individual privacy in a manner so obtrusive as to make it impossible for an unwilling person to avoid exposure to it; or any "pandering". (386 U.S. at 769, 87 S.Ct. 1414).

11. United States v. 4,400 Copies of Magazines, etc., 276 F.Supp. 902, 903 (D.Md. en banc, 1967).

12. Village Books, Inc. v. State's Attorney, 263 Md. 76, 88, 282 A.2d 126 (1971).

13. "Yum Yum" (Government's Exhibit 3–A) and "Yum Yum No. 2" (Government's Exhibit 3–R). If there be any difference in the rottenness of the fruits, that of the Yum Yum tree would rank with the worst.

14. See United States v. 127,295 Copies of Magazines, 295 F.Supp. 1186, and particularly pages 1188–1189.