Commonwealth *v.* Dell Publications, Inc.,
Appellant.

Argued April 25, 1967. Before BELL, C. J., MUS-
MANNO, JONES, EAGEN, O'BRIEN and ROBERTS, JJ.

*Albert B. Gerber,* with him *Gerber, Galfand & Berger,* for appellants.

*David L. Creskoff,* Assistant District Attorney, with him *Alan J. Davis,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, September 29, 1967:

In response to a complaint in equity filed by the District Attorney of Philadelphia County, the court of common pleas of that county held a hearing to determine whether the book "Candy" was obscene within the meaning of the Act of June 1, 1956, P. L. (1955) 1997, as amended, September 22, 1961, P. L. 1587, 18 P.S. §3832.1[1] and the First and Fourteenth Amendments to the Constitution of the United States.[2]

A hearing on the district attorney's complaint was held in March 1965, but the court below withheld its adjudication pending the disposition by the Supreme Court of the United States of three obscenity cases then on appeal to that Court.[3] On June 9, 1966, the

---

[1] The Act of June 1, 1956, P. L. (1955) 1997, as amended, 18 P.S. §3832.1 provides: "The district attorney of any county in which any person sells, distributes, . . . any comic book, magazine, book, . . . which is obscene, may institute proceedings in equity in the court of common pleas of said county for the purpose of enjoining [its] sale, resale . . . . A preliminary injunction may issue and a hearing thereafter be held . . . upon the averment of the district attorney that the sale, resale, distribution or consignment of such publication constitutes a danger to the welfare or peace of the community."

[2] Compare Pa. Const., Art. I, §7.

[3] *Mishkin v. New York,* 383 U.S. 502, 86 S. Ct. 958 (1966); *Ginzburg v. United States,* 383 U.S. 463, 86 S. Ct. 942 (1966); *Memoirs v. Massachusetts,* 383 U.S. 413, 86 S. Ct. 975 (1966).

court below, obviously frustrated because the long awaited decisions did not materially ease its task,[4] found "Candy" to be an obscene publication within the meaning of the Pennsylvania Act and hence not entitled to the protection of the First and Fourteenth Amendments. See *Roth v. United States,* 354 U.S. 476, 77 S. Ct. 1304 (1957). Exceptions were filed but they were overruled by the court en banc. The Dell Publishing Company, and the five additional defendants in the action below, have appealed from the issuance of a permanent injunction enjoining the sale and distribution of "Candy" in Philadelphia County.

We reverse, for the reasons stated hereinafter, because we conclude that the court below erroneously interpreted the standards for determining obscenity set forth by the Supreme Court of the United States and, in particular, viewed the book from a perspective inconsistent with these opinions. Our decision in this case, however, should not, in any manner, be construed as an approval of "Candy"—indeed some members of this Court personally find the book to be revolting and disgusting. While we respect the views of those who believe this book is "obscene" we hold it does not fall within the class of "legal obscenity" so that, in a free society, its circulation may be indiscriminately prohibited.[5]

---

[4] One commentator has suggested, "respectfully but firmly" that by its 1966 trilogy "the Court has turned the law of obscenity into a constitutional disaster area." Magrath, The Obscenity Cases: Grapes of Roth, 1966 S. Ct. Review 7, 59. This view is apparently shared by others, see Monaghan, Obscenity, 1966: The Marriage of Obscenity Per Se and Obscenity Per Quod, 76 Yale L.J. 127 (1966); Note, More Ado About Dirty Books, 75 Yale L.J. 1364 (1966).

[5] Although this point will be made again in this opinion, we wish to stress at the outset that this case does not involve an attempt to limit the scope of the injunction to a carefully defined group such as juveniles. See *Commonwealth v. Robin,* 421 Pa. 70,

The Constitution has thrust upon the judiciary the obligation of acting as a Board of Censors which requires us to consider each challenged work on a case-by-case basis.[6] Yet in approaching this arduous and unpleasant task we must be mindful of our inherent limitations. For as Mr. Justice DOUGLAS has reminded us, "we are judges, not literary experts or historians or philosophers. We are not competent to render an independent judgment as to the worth of this or any other book, except in our capacity as private citizens. . . . If there is to be censorship, the wisdom of experts on such matters as literary merit and historical significance must be evaluated . . . [and a conclusion reached] irrespective of whether we would include [the challenged work] in our own libraries."[7] The necessity of such an approach was articulated by Judge MOORE of the Second Circuit in an opinion holding, largely on the basis of expert testimony, that, despite his obvious adverse reaction, the Swedish Film "491" was not constitutionally obscene:[8] "I [Judge MOORE] personally found '491' repulsive and revolting. . . . Were I to be vested with dictatorial powers, I would ban and destroy the trash (in my opinion) which infests the news kiosks and the movie theatres in certain areas of New York City. I would do all this

---

72. 218 A. 2d 546, 547 (1966) (concurring opinion) ; cf. Act of August 14, 1963, P. L. 829, 18 P.S. §3831 (Supp. 1966) ; *Memoirs v. Massachusetts*, 383 U.S. at 421 n.8, 86 S. Ct. at 978 n.8. See also *Redrup v. New York*, 386 U.S. 767, 87 S. Ct. 1414 (1967).

[6] See, e.g., *Memoirs v. Massachusetts*, supra note 3; *Jacobellis v. Ohio*, 378 U.S. 184, 84 S. Ct. 1676 (1964) ; *Manual Enterprises, Inc. v. Day*, 370 U.S. 478, 488, 82 S. Ct. 1432, 1437 (1962).

[7] *Memoirs v. Massachusetts*, 383 U.S. at 427, 86 S. Ct. at 981-82 (concurring opinion). See also *Smith v. California*, 361 U.S. 147, 160, 169, 80 S. Ct. 215, 222, 227 (1959) (FRANKFURTER & HARLAN, JJ., concurring).

[8] *United States v. One Carton Positive Motion Picture Film Entitled "491"*, 367 F. 2d 889, 897 n.3 (2d Cir. 1966).

in the vainglorious belief that I was acting as a Beneficent Tyrant for the good of all Mankind. But the very utterance of these thoughts is more than sufficient reason to shy away from censorship except in extreme cases. If we are to survive, we should probably survive on the Darwinian theory which should include the ability to cope with our current books, stage and cinema."

In the instant litigation, however, both the comments made during the hearing and the formal adjudication indicate that the hearing judge proceeded on the premise that, in the final analysis, his own subjective reaction, in and by itself, was the determining factor.[9] As the law of obscenity now stands the judge's subjective analysis is of course relevant to the ultimate issue,[10] but the mere donning of judicial robes does not make us the embodiment of the "average person" nor do our tastes necessarily parallel those of the "contemporary community."

The totally subjective approach adopted by the court below was palpable error. "The suppression of a book requires not only an expression of judgment by the court that it is so bad, in the view of the Judges, that it is offensive to community standards of decency as the Legislature has laid them down, but also that it is so bad that the constitutional freedom to print has been lost because of what the book contains. The history and tradition of our institutions stand against the suppression of books." *Larkin v. G. P. Putnam's Sons*, 14 N.Y. 2d 399, 401, 200 N.E. 2d 760, 761 (1964).

Constitutional fact finding is an essential element of any obscenity case[11] because "all ideas having even

---

[9] See Record, e.g., 51a, 71a, 159a, 257a, 267a, 382a.

[10] But see the views of Justices BLACK, DOUGLAS and STEWART in the cases cited supra note 3.

[11] The relationship of constitutional fact finding to the law of obscenity is definitively set forth in Mr. Justice BRENNAN's opinion in *Jacobellis v. Ohio*, supra, note 6.

the slightest redeeming social importance—unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have the full protection of [constitutional] guaranties, unless excludable because they encroach upon the limited area of more important interests." *Roth v. United States*, 354 U.S. 476, 484, 77 S. Ct. 1304, 1309 (1957). But, the *Roth* Court continued, "implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance." *Ibid.* Thus the determination that a book is obscene carries with it the conclusion that the book is not speech within the meaning of the First Amendment.

However, the last quoted sentence from *Roth* is logically circular and can be interpreted in either of two ways. On the one hand, one can conclude, as do Justices CLARK and WHITE,[12] that obscenity by definition has no redeeming social importance. On the other hand, Justice BRENNAN believes that a work which has even a minimum of social importance is by definition not obscene, a view shared by Chief Justice WARREN and Justice FORTAS.[13] Since Justices BLACK, DOUGLAS and STEWART believe that the BRENNAN approach is too restrictive, we must accept the BRENNAN analysis as "settled law" with respect to obscenity *vel non*, at least until five members of the Court agree on a new definition. This is because simple arithmetic shows that the votes of the "BRENNAN block" along with that of the "BLACK-DOUGLAS-STEWART axis" will, of necessity, result in a finding that the work, in the absence of pandering,[14] is entitled to constitutional protection.[15]

---

[12] See *Memoirs v. Massachusetts*, supra note 3 (dissenting opinions).

[13] See *Memoirs v. Massachusetts*, supra note 3.

[14] See *Ginzburg v. United States*, supra note 3; cf. *Mishkin v. New York*, supra note 3.

[15] Mr. Justice HARLAN believes that different standards should apply in federal and state obscenity cases. See his opinions in

The impact of Mr. Justice BRENNAN'S analysis means that in determining the constitutional fact of obscenity *vel non* the evidence must be viewed in a light favorable to the book's circulation. As we read his opinions in *Roth* and *Memoirs,* any other approach would not provide first amendment freedoms with the necessary "breathing space to survive." *NAACP v. Button,* 371 U.S. 415, 433, 83 S. Ct. 328, 338 (1963). Compare, Monaghan, Obscenity, 1966: The Marriage of Obscenity Per Se and Obscenity Per Quod, 76 Yale L.J. 127, 150-55 (1966).

Finally, before turning to the evidence presented in the instant case, it should be pointed out that neither *Ginzburg v. United States,* 383 U.S. 463, 86 S. Ct. 942 (1966), nor *Mishkin v. New York,* 383 U.S. 502, 86 S. Ct. 958 (1966), decided the same day as *Memoirs,* is, as the court below recognized, relevant to the case at bar. In *Ginzburg* a majority of the Court adopted the variable approach to obscenity[16] which had long been advocated by Mr. Chief Justice WARREN.[17] The Court

---

*Memoirs v. Massachusetts,* 383 U.S. at 455, 86 S. Ct. at 996 and *Roth v. United States,* 354 U.S. 476, 496, 77 S. Ct. 1304, 1315 (1957).

[16] For a full exposition of variable obscenity see Lockhart & McClure, Obscenity Censorship: The Core Constitutional Issue—What is Obscene?, 7 Utah L. Rev. 289 (1961); Lockhart & McClure, The Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn. L. Rev. 5 (1960).

[17] "It is not the book that is on trial; it is a person. The conduct of the defendant is the central issue, not the obscenity of a book or picture. The nature of the materials is, of course, relevant as an attribute of the defendant's conduct, but the materials are thus placed in context from which they draw color and character. A wholly different result might be reached in a different setting." *Roth v. United States,* 354 U.S. 476, 495, 77 S. Ct. 1304, 1314-15 (1957) (WARREN, C. J., concurring). See *Ginzburg v. United States,* 383 U.S. 463, 474-76, 86 S. Ct. 942, 949-50 (1966). See also *Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 445, 77 S. Ct. 1325, 1330 (1957) (WARREN, C. J., dissenting).

proceeded on the assumption that the materials in question were not themselves obscene (indeed it all but conceded this point) but held that Ginzburg's method of "pandering" his wares made them obscene. In *Mishkin* the defendant's conduct, rather than the materials themselves, was also the focus of the Court's concern. Moreover, Mishkin's sole contention regarding the nature of his books was not their obscenity *vel non* but rather whether the prurient appeal of the work was to be judged in terms of its effect on the average person or is to be assessed in terms of its effect on the members of the "intended and probable recipient group."[18]

No evidence whatsoever was presented at the proceedings below concerning the conduct of the present appellants. The procedural posture of this case is identical with that of *Memoirs*, for in both instances it was the book which was on trial.[19] In his opening

---

[18] *Mishkin v. New York*, 383 U.S. 502, 509, 86 S. Ct. 958, 964 (1966). "Candy's" audience was the community-at-large rather than a deviate sector as in *Mishkin*.

[19] We recognize of course that the instant litigation was instituted against "Candy's" publisher and distributor. However, the whole focus of 18 P.S. §3832.1 is upon the book itself and it clearly was the book, not the publisher or distributor, which was on trial. Cf. *Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 77 S. Ct. 1325 (1957). No evidence was introduced below which even alluded to any other issue. Nor was there any suggestion that any of the defendants went about their business with "the leer of the sensualist" or made any statements remotely similar to those made by defendants Mishkin and Ginzburg which proved so decisive in their respective appeals.

The Commonwealth in its brief does attempt to bring "Candy" within the *Ginzburg-Mishkin* pandering rationale but its arguments on this point border on the absurd. First it suggests that the appellants were guilty of pandering because "Candy" was also sold in a paperback edition. The *Ginzburg* Court itself emphatically rejected the equation of profit with pandering, 383 U.S. at 474-75, 86 S. Ct. at 949. See also *Redrup v. New York*, 386 U.S. 767, 87 S.

sentence in the *Memoirs* opinion, Mr. Justice BRENNAN emphasized the crucial importance this difference made when he pointedly said: "This is an obscenity case in which ["Fanny Hill"] was adjudged obscene in a proceeding that put on trial the book itself, and not its publisher or distributor." 383 U.S. at 415, 86 S. Ct. at 975. And as in *Memoirs,* it does not necessarily follow from our holding in this case "that a determination that ["Candy"] is obscene in the constitutional sense would be improper under all circumstances," see id. at 420, 86 S. Ct. at 978.

## Candy and the Roth-Memoirs Test

For our purpose a lengthy description of "Candy" is unnecessary. It is sufficient to note that the plot is devoted almost exclusively to the normal and abnormal sexual adventures of its heroine, a coed named Candy Christian, and that these adventures are described in considerable detail. Every one of its 15 chapters centers around a particular sexual incident in the heroine's life. It is generally conceded, by the book's friends and foes, that it is a satire or at least an attempt at satire upon the cultural ideals of our contemporary society.

*Roth* defines obscenity in the following terms, which incidentally are identical with the definition given in

---

Ct. 1414 (1967) (involving paperback publications). Secondly, the Commonwealth argues that pandering may be found because one of the defense witnesses advertised "Candy" in a brochure which was "blatantly aimed at an audience solicited to purchase the various books for their prurient interest appeal only." The man in question, however, was a witness, not a defendant and it was never suggested that any of the defendants were in any way responsible for the advertisement. Moreover, although this brochure did advertise "Candy" and other books which are legitimately classified as erotic literature it also contained advertisements for such books as the "American Everyday Dictionary" and Thoreau's "Walden."

18 P.S. §3833: "[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." 354 U.S. 476, 489, 77 S. Ct. 1304, 1311 (1957). "Under this definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value." *Memoirs v. Massachusetts,* 383 U.S. 413, 418, 86 S. Ct. 975, 977 (1966) (BRENNAN, J.). Keeping in mind that "Candy" must meet *each* of the above mentioned tests before it can be declared legally obscene, we shall consider separately the evidence adduced below on each of the three elements.

A. *Appeal to Prurient Interest:* This is perhaps the most difficult of the three elements to define; what appeals to the prurient interest of one individual may not appeal to the prurient interest of another.[20] Some cases may pose a problem of group definition,[21] but it is conceded that "Candy's" appeal is to the community at large and thus we must judge its prurient appeal to the "average person."

Unfortunately, there was practically no testimony offered concerning "Candy's" appeal to the prurient interest of the average adult citizen.[22] Most of the Com-

---

[20] See, e.g., the dissenting opinions of Justices BLACK, DOUGLAS and STEWART in *Ginzburg v. United States,* 383 U.S. 463, 86 S. Ct. 942 (1966).

[21] E.g., *Mishkin v. New York,* 383 U.S. 502, 86 S. Ct. 958 (1966): cf. *Manual Enterprises, Inc. v. Day,* 370 U.S. 478, 82 S. Ct. 1432 (1962).

[22] "Predominant appeal shall be judged with reference to ordinary adults unless it appears from the character of the material or

monwealth's witnesses, as well as the judge himself, were primarily concerned with the book's adverse effect on children, teenagers, and emotionally unstable individuals, a point which is generally conceded by the defense. At the same time some of the Commonwealth's witnesses conceded that the book's prurient appeal to the emotionally mature adult would be de minimis at most.

Over half a century ago Judge LEARNED HAND spoke out against the then prevailing test of obscenity, derived from *Regina v. Hicklin*, [1868] 3 Q.B. 360, which judged a work in terms of its effect on the most susceptible recipient group: "To put thought in leash to the average conscience of the time is perhaps tolerable, but to fetter it by the necessities of the lowest and least capable seems a fatal policy." *United States v. Kennerley*, 209 Fed. 119, 121 (S.D.N.Y. 1913). The *Hicklin* test has been subsequently rejected by the Supreme Court of the United States and the one advocated by Judge HAND substituted therefor. See *Roth v. United States*, 354 U.S. 476, 77 S. Ct. 1304 (1957); *Jacobellis v. Ohio*, 378 U.S. 184, 84 S. Ct. 1676 (1964); *Smith v. California*, 361 U.S. 147, 160, 169, 80 S. Ct. 215, 222, 227 (1959) (FRANKFURTER and HARLAN, JJ., concurring). This does not mean that society may not by carefully drawn statutes prevent juveniles from obtaining literature which may have an adverse effect on them. See *Commonwealth v. Robin*, 421 Pa. 70, 72, 218 A. 2d 546, 547 (1966) (concurring opinion); cf. *Redrup v. New York*, 386 U.S. 767, 87 S. Ct. 1414 (1967). But to destroy literature solely because of its possible effect on the children, and thus "reduce

---

the circumstances of its dissemination to be designed for children or other specially susceptible audience." A.L.I. Model Penal Code, §251.4(1) (O.D. 1962). See *Roth v. United States*, 354 U.S. 476, 487 n.20, 77 S. Ct. 1304, 1310 n.20 (1957).

the adult population . . . to reading only what is fit for children," is surely, as Mr. Justice FRANKFURTER observed, "to burn the house to roast the pig." See *Butler v. Michigan,* 352 U.S. 380, 383, 77 S. Ct. 524, 526 (1957), holding that Michigan could not constitutionally prevent any circulation of a book merely because of its potential deleterious influence on youth. Cf. *Ginzburg v. United States,* 383 U.S. 463, 465 n.3, 86 S. Ct. 942, 944 n.3 (1966). Thus, in the absence of any attempt to prohibit "Candy's" sales to children, the testimony concerning its effect on children was largely irrelevant.

Nevertheless, we shall assume that the Commonwealth has adequately shown that "the dominant theme . . . taken as a whole appeals to a prurient interest in sex." This area is one where a judge's subjective reaction is most relevant; the hearing judge, the court en banc below, and the members of this Court agree that "Candy" has the requisite prurient appeal.

B. *Contemporary Community Standards:* Before a finding of legal obscenity can be sustained the evidence must show that "the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters." *Memoirs v. Massachusetts,* 383 U.S. at 418, 86 S. Ct. at 977 (1966) ; see *Commonwealth v. Baer,* 209 Pa. Superior Ct. 349, 227 A. 2d 915 (1967) ; cf. *Manual Enterprises, Inc. v. Day,* 370 U.S. 478, 82 S. Ct. 1432 (1962) (HARLAN, J.). Most of the debate over the term "contemporary community standards" has centered around the question of whether the relevant community is to be defined in terms of the nation-at-large or some smaller sector. Compare *Jacobellis v. Ohio,* 378 U.S. 184, 84 S. Ct. 1676 (1964) (BRENNAN, J.) with id. at 199, 84 S. Ct. at 1684 (WAR-

REN, C. J., dissenting).[23] However, since the instant case arose out of Philadelphia County, one of the nation's more sophisticated areas, the resolution of this debate is not essential to our disposition. Cf. *Commonwealth v. Baer,* supra at 353 n.3, 227 A. 2d at 918 n.3.

One aspect of obscenity litigation in which the Supreme Court seems to be unanimous is that contemporary community standards are to be judged by the standards of the current year rather than by the standards of 5, 10, 50, or 100 years ago.[24] See *Jacobellis v. Ohio,* supra; *Smith v. California,* 361 U.S. 147, 160, 169, 80 S. Ct. 215, 222, 227 (1959) (FRANKFURTER and HARLAN, JJ. concurring). This is also the test of The American Law Institute Model Penal Code which has been cited with approval by the Court in *Roth* and subsequent cases. Indeed the Commonwealth's brief, which devotes less than one hundred words to the contemporary community standards problem, conceded this point.

There are two yardsticks by which contemporary community standards may be judged. One is to compare the challenged book to other books which have either been held entitled to the protection of the First Amendment or, in the absence of litigation, which meet contemporary standards and are substantially similar to the challenged book. The other is to consider the reception the book received from the community when

---

[23] Four members of the Supreme Court, Justices BLACK, DOUG-LAS. BRENNAN and STEWART, have clearly stated that they believe the relevant community is the nation. The votes of Justices WHITE and FORTAS in the obscenity cases decided in June 1967, discussed infra, seem to imply that they too have adopted this view.

[24] A vast number of books, which are now considered classics, were at one time banned. See, e.g., Judge BOK's list in *Commonwealth v. Gordon,* 66 Pa. D. & C. 101, 115-17 (1949).

it was released.[25] Regardless of our own personal views, under either test, the undisputed evidence clearly demonstrates that the court below erred when it concluded that "Candy" went far beyond customary limits of candor.[26]

The Commonwealth presented practically no evidence whatsoever concerning "Candy's" relationship to contemporary community standards.[27] While its witnesses[28] testified that in their personal view "Candy" far exceeded customary limits of candor, they admitted being totally unfamiliar with contemporary fiction. Two of the witnesses had indeed read "Tropic of Cancer," but despite a clear Supreme Court holding to the contrary[29] they continued to believe the book ought to be banned. While we respect these personal opinions, it does indicate that their views of contemporary

---

[25] This second yardstick will not be available in all instances. See, e.g., the books held to be not constitutionally obscene in *Redrup v. New York*, 386 U.S. 767, 87 S. Ct. 1414 (1967) and its progeny discussed infra. See also *Commonwealth v. Baer*, 209 Pa. Superior Ct. 349, 227 A. 2d 915 (1967).

[26] Compare *United States v. One Carton Positive Motion Picture Film Entitled "491"*, 367 F. 2d 889, 896-98 (2d Cir. 1966); *Commonwealth v. Baer*, supra note 25.

[27] "Under cross-examination, most of the [Commonwealth's] witnesses admitted they had read little of the modern outpouring of erotic novels, and hence were not able to compare 'Candy' with other contemporary works of its general kind." Opinion of the hearing judge, Record p. 380a.

[28] The Commonwealth called as its witnesses, Dr. John J. Kane, a Professor of Sociology at Notre Dame, Rev. Paul G. Larkin, a Roman Catholic priest, Dr. Austin J. App, a Professor of English at LaSalle College, Rev. Carter W. Merbreier, a Lutheran minister, James J. O'Donnell, the head of a small anti-pornography group, and Frank R. Ryan, a court psychologist, who dealt with problem children.

[29] *Grove Press, Inc. v. Gerstein*, 378 U.S. 577, 84 S. Ct. 1909 (1964); see *Commonwealth v. Robin*, 421 Pa. 70, 218 A. 2d 546 (1966).

standards differ markedly from those of the Supreme Court.[30]

On the contrary, the defense witnesses[31] showed considerable familiarity with contemporary erotic literature. They testified that while "Candy" might have exceeded customary limits of candor in the early 1960's it did not exceed them when published in 1964. In comparing "Candy" to other allegedly obscene books, one witness described it as a "fairy tale" when compared with William Borroughs' "Naked Lunch" and another found it to be a far superior book to "Fanny Hill" which he described as "purely pornographic junk." Both these books, in litigation concluded subsequent to this testimony, have been held not to be legally obscene.[32]

When "Candy" was first published in this country it was reviewed in over a hundred newspapers and periodicals, many of which were introduced by the defense in the proceedings below. While many of these reviews panned the book and some showed utter distaste for it, almost without exception, they recognized it as

[30] For illustrative and comparison purposes see, e.g., the description of the book, "Sex Life of A Cop," by the United States Court of Appeals for the Sixth Circuit in *United States v. West Coast News Co.*, 357 F. 2d 855, 857-58 (1966) (reprinted in Appendix B) rev'd sub nom; *Aday v. United States*, 388 U.S. 447, 87 S. Ct. 2095 (1967) and the description of the book, "Orgy Club," by the Ohio Court of Appeals in *State v. Mazes*, 209 N.E. 2d 496, 498 (1965), aff'd 7 Ohio St. 2d 136, 218 N.E. 2d 725 (1966), rev'd 388 U.S. 453, 87 S. Ct. 2105 (1967). See generally the discussion of *Redrup v. New York* and its progeny infra.

[31] The defense witnesses consisted of Dr. Morse Peckham, a Professor of English at the University of Pennsylvania, Mr. Lyle Stuart, a New York publisher, Dr. Albert Goldman, a Professor of English literature at Columbia University, and Dr. Martin Oppenheimer, a Professor of Sociology at Haverford College.

[32] *Memoirs v. Massachusetts*, 383 U.S. 413, 86 S. Ct. 975 (1966) ("Fanny Hill"); *Attorney General v. A. Book Named "Naked Lunch"*, 351 Mass. 298, 218 N.E. 2d 571 (1966).

a serious attempt at satire, and again almost without exception, concluded it was not pornography. Typical of these reviews were those published in the mass media magazines of "Life," "Newsweek," and "Time," excerpts of which we have reprinted in Appendix A.[33] In addition, within a relatively short time following its publication "Candy" sold over two and a half million copies in the hard cover edition and appeared on the New York Times Best Seller List for 35 weeks; during this period sales in Philadelphia department stores reflected the book's popularity. For two weeks during September 1964 it was the number two best seller in the nation. Since most, if not all, of the books discussed in the last part of this opinion, which have been held not to be legally obscene, are never reviewed and never approach the best seller category, "Candy's" reception by the American press and public is highly significant.

C. *Redeeming Social Importance:* Following the conclusion of the "Fanny Hill" litigation, in which the Supreme Judicial Court of Massachusetts was reversed by the Supreme Court of the United States, the Massachusetts Court had occasion to consider the obscenity *vel non* of William Borroughs' "Naked Lunch." Although to the Court the book was "grossly offensive" and was "what the author himself says, 'brutal, obscene and disgusting,'" it nevertheless held in a per curiam opinion that the book was protected by the First Amendment: "As to whether the book has any redeeming social value, the record contains many reviews and articles in literary and other publications discussing

---

[33] While we do not consider these magazines the arbiters of contemporary community standards, and certainly not the standards of the avant-garde communities, they probably reflect the average community mores as well as any other tangible standard. Nor are the views of these magazines to be equated with what constitutes redeeming social importance.

seriously this controversial book portraying the hallucinations of a drug addict. Thus it appears that a substantial and intelligent group in the community believes the book to be of some literary significance. Although we are not bound by the opinions of others concerning the book, we cannot ignore the serious acceptance of it by so many persons in the literary community. Hence, we cannot say that 'Naked Lunch' has no 'redeeming social importance in the hands of those who publish or distribute it on the basis of that value.' See the Memoirs case at p. 421 [86 S. Ct. at p. 979]." *Attorney General v. A Book Named "Naked Lunch"*, 351 Mass. 298, 299, 218 N.E. 2d 571-72 (1966).

From what has been said in the section under contemporary community standards it should be evident that "Candy" has at least a minimum or modicum of social value, which is all that is required, absent evidence of pandering, to shield a book with the protection of the First Amendment. For, as Mr. Justice BRENNAN stated in *Memoirs,* 383 U.S. at 419, 86 S. Ct. at 978 (emphasis in original) : "A book cannot be proscribed unless it is found to be *utterly* without redeeming social value. This is so even though the book is found to possess the requisite prurient appeal and to be patently offensive. Each of the three federal constitutional criteria is to be applied independently; the social value of the book can neither be weighed against nor canceled by its prurient appeal or patent offensiveness."[34]

In addition, several of the Commonwealth's own witnesses' testimony indicates that "Candy" has a "modicum" of social value, although they felt this

---

[34] See also *Zeitlin v. Arnebergh,* 59 Cal. 2d 901, 920, 31 Cal. Rptr. 800, 813, 383 P. 2d 152, 165 (1963) ; *People v. Bruce,* 31 Ill. 2d 459, 461, 202 N.E. 2d 497, 498 (1964) ; *Trans-Lux Distributing Corp. v. Maryland Bd. of Censors,* 240 Md. 98, 104-05, 213 A. 2d 235, 238-39 (1965).

value is far outweighed by the book's decadence and that its impact is destructive rather than constructive. One witness, for example, conceded that "Candy" was a "reputed spoof on sex" and admitted that many emotionally mature adults, although not the "average person" would so view it. Another witness stated that "Candy's" authors "intended to portray a philosophy of life" in which sex was glorified as a way of life, "a standard of living that should be embraced by all, disregard [sic] for any discipline whatsoever." A third who felt "sex is dynamite" and "not something to play with or joke about" viewed the book as a "slander against proper authority." Yet the essence of the First Amendment is the protection of free advocacy of ideas —"unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion," *Roth v. United States,* 354 U.S. 476, 484, 77 S. Ct. 1304, 1309 (1957)—and a book may not be banned simply because it is ideologically obscene.[35] See *Kingsley International Pictures Corp. v. Regents of the State University of New York,* 360 U.S. 684, 79 S. Ct. 1362 (1959).[36]

---

[35] For example, no one would suggest that books like Marx's "Communist Manifesto", Hitler's "Mein Kampf", or Mao Tse-tung's "Quotations from the Red Book" could be constitutionally banned even though they seek to undermine the very essence of our society But cf. *Commonwealth v. Robin,* 421 Pa. 70, 90, 218 A. 2d 546, 555-56 (1966) (MUSMANNO, J., dissenting).

[36] Although *Kingsley* involved a motion picture admittedly not obscene, Mr. Justice STEWART, speaking for the Court, pertinently observed, 360 U.S. at 688-89, 79 S. Ct. at 1365: "It is contended that the State's action was justified because the motion picture attractively portrays a relationship which is contrary to the moral standards, the religious precepts, and the legal code of its citizenry. This argument misconceives what it is that the Constitution protects. Its guarantee is not confined to the expression of ideas that are conventional or shared by a majority. It protects advocacy of the opinion that adultery may sometimes be proper, no less than advocacy of socialism or the single tax. And in the realm of ideas it protects expression which is eloquent no less than that which is unconvincing."

The "modicum" of social importance which saved "Fanny Hill" was that: "there was expert testimony, much of which was strained, to the effect that Memoirs is a structural novel with literary merit; that the book displays a skill in characterization and a gift for comedy; that it plays a part in the history of the development of the English novel; and that it contains a moral, namely, that sex with love is superior to sex in a brothel." *Attorney General v. A Book named "John Cleland's Memoirs of a Woman of Pleasure,"* 349 Mass. 69, 73, 206 N.E. 2d 403, 406 (1965), quoted in *Memoirs v. Massachusetts,* 383 U.S. at 419, 86 S. Ct. at 977-78. The expert testimony in the instant case went at least as far.[37] Indeed the trial court's own evaluation of the testimony offered at the proceeding below

---

[37] To demonstrate this, all we need do is quote from the trial judge's summarization of the two defense witnesses who addressed themselves to the book's social value: "A Princeton Ph. D., professor of English at the University of Pennsylvania, called it 'a work of literature'—though, he conceded, not a very good one. It was concerned with a serious moral and emotional problem, he said—the idea upheld in our culture of the satisfaction to be found in giving oneself to others, which the book brought into question. It was reasonably funny. He considered 'Fanny Hill' to be outright pornography, and if so 'Candy' was not, he declared." Opinion of the hearing judge, Record p. 380a.

"A professor of English literature at Columbia University testified that he considered 'Candy' an important book, not great but significant, in the tradition of Roman satire but presenting a new technique. It had social importance, he said, as a bitter attack on the 'specious goodness' inherent in the false and hypocritical idea of the 'American Dream girl'—the stereotype of woman as pure, beautiful, wholesome, sweet and devoted to everyone's welfare but her own. The sex scenes, he said, were not written to arouse sexual desires or to advocate improprieties but rather as caricatures. He did concede, however, that the book might stimulate some young people to improper acts. Nevertheless he believed 'Candy' might very likely be recommended for college reading in a course on modern comic fiction." Id. at 381a. See also the book review excerpts in Appendix A.

is the best evidence that the court did not adhere to the standards or approach outlined above: "Summed up, the Commonwealth's testimony comprises in the main personal judgments of witnesses, with merely a dash of measurement against contemporary literature, that 'Candy' is a 'dirty book'; while the defense testimony is a rather more erudite assessment of the book as a satire possessed of social importance. Under the law as we piece it together, however, we do not regard the testimony of witnesses either way as binding on the Court. The assessment of a book by those testifying is a guide and an aid to the Court, more or less valuable and persuasive as the apparent knowledge and stature of the individual witness merits. The judge may not be motivated solely by his personal predilections but must strive as far as possible to be objective. Yet in his final wrestling with his soul he cannot put aside entirely his subjective determination. He must read the book himself, take into account the views of witnesses and the reviews of critics and the arguments of counsel, and then ultimately come up with his own reaction to his reading. Despite the impressive testimony of the defense witnesses, despite the prodigious diligence of the defense counsel in marshaling precedents and arguments, our conclusion is definitely and unequivocally that 'Candy' is legally obscene." It is thus evident that the court below considered only the first of three *sine qua non* elements set forth in *Memoirs*.

### Obscenity Litigation During the October 1966 Term

One constant aspect of obscenity litigation in the Supreme Court of the United States during the past decade seems to be that action speaks louder than words. Thus the convictions of Messrs. Mishkin and

Ginzburg were upheld more because of what they did than because of what they published. Moreover, although a majority of the Court has yet to agree on a precise test for determining obscenity, their summary reversal of a number of cases during the term just completed does provide some guide to the ultra-pragmatic approach the Court is taking in this area. Significantly, the Court has yet to find a published work obscene per se.[38]

On May 8, 1967, without the fanfare of its 1966 trilogy, the Court handed down a cryptic per curiam opinion disposing of three consolidated cases, *Redrup v. New York,* 386 U.S. 767, 87 S. Ct. 1414, which may yet prove to be the most significant of its obscenity opinions. The impact of this opinion, along with those cases summarily decided on the last day of the Term, comes as close to a holding that, in the eyes of the present Court, "Candy" is not per se constitutionally obscene as is possible without a direct ruling on the bock itself. Although the Court had originally granted review in *Redrup* to consider problems of *scienter* upon the assumption that the materials involved were obscene in the constitutional sense, it decided to dispose of the case upon the ground that they were not

---

[38] In *Roth* and its companion case, *Alberts v. California,* the Court proceeded on the assumption, not challenged by the defendants, that the materials involved were properly classified as obscenity, the only issue being whether obscenity was protected by the First Amendment. 354 U.S. at 481 n.8, 77 S. Ct. at 1207 n.8. In *Ginzburg,* the Court proceeded on the assumption that the materials involved were not constitutionally obscene per se but that the defendant's conduct made them so. Finally, in *Mishkin,* the only other case where the Court has written an opinion affirming an obscenity conviction, Mishkin evidently did not challenge the New York Court's findings that his material consisted of hard-core pornography, but limited his appeal to the question of whether the material appealed to the prurient interest of the average person. See 383 U.S. at 508, 86 S. Ct. at 963.

obscene under the First and Fourteenth Amendments.[39] The Court noted that while it was badly split concerning the precise definition of obscenity, each of the seven justices who reached the merits[40] agreed that under their individual approaches the materials were not legally obscene. Involved in the cases decided by *Redrup* were two paperbacks, "Lust Pool" and "Shame Agent", and ten so-called "girlie" magazines such as "High Heels", "Gent", and "Swank."

*Redrup* seems to signify the Court's final abandonment of its futile search for a definition of obscenity *vel non*. For significantly, instead of attempting to determine what constituted obscenity, the Court approached the problem in terms of those circumstances under which the publication of otherwise unobjectionable material might be constitutionally restricted, 87 S. Ct. at 1415: "In none of the cases was there a claim that the statute in question reflected a specific and limited state concern for juveniles. See Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 64 S. Ct. 438, 88 L. Ed. 645; cf. Butler v. State of Michigan, 352 U.S. 380, 77 S. Ct. 524, 1 L. Ed. 2d 412. In none was there any suggestion of an assault upon individual privacy by publication in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it. Cf. Breard v. City of Alexandria, 341 U.S. 622, 71 S. Ct. 920, 95 L. Ed. 1233; Public Utilities Comm'n of District of Columbia v. Pollak, 343 U.S. 451, 72 S. Ct. 813, 96 L. Ed. 1068. And in none was there evidence of the sort of 'pandering' which the

---

[39] Justices BLACK, DOUGLAS and STEWART would have granted review without any such limitation. See *Gent v. Arkansas*, 384 U.S. 937, 86 S. Ct. 1454; *Redrup v. New York*, 384 U.S. 916, 86 S. Ct. 1362 (1966).

[40] Justices CLARK and HARLAN objected to the Court's decision to dispose of the cases on grounds specifically excluded from review.

Court found significant in Ginzburg v. United States, 383 U.S. 463, 86 S. Ct. 942, 16 L. Ed. 2d 31."

As has already been indicated in this opinion, none of the three situations described in *Redrup* are present in the case at bar. The importance of *Redrup* to obscenity litigation in general, and to the instant case in particular, is amply demonstrated by eleven decisions handed down by the Court on the last day of the 1966 Term, June 12, 1967.[41] In each case the Court granted certiorari and summarily reversed an obscenity conviction citing *Redrup* as its sole authority.[42] In other words, none of the materials involved in these litigations was, in the Court's view, obscene in the constitutional sense. Thus *Redrup* suggests that the Court en banc and each of the individual judges have adopted an "I know it when I see it"[43] test for obscenity. Nevertheless, a glance at the type of books held to be protected under *Redrup's* aegis clearly demonstrates the divergence between the Supreme Court's utilization of

---

[41] Two other obscenity cases were reversed on non-*Redrup* grounds, *Cornith Publications, Inc. v. Wesberry*, 388 U.S. 418, 87 S. Ct. 2096 (1967) and *Rosenbloom v. Virginia*, 388 U.S. 450, 87 S. Ct. 2095, and two appeals were dismissed as moot, *Jacobs v. New York*, 388 U.S. 431, 87 S. Ct. 2098, and *Tannenbaum v. New York*, 388 U.S. 439, 87 S. Ct. 2107.

[42] *Schackman v. California*, 388 U.S. 454, 87 S. Ct. 2107 (1967); *Mazes v. Ohio*, 388 U.S. 453, 87 S. Ct. 2105 (books); *Books, Inc. v. United States*, 388 U.S. 449, 87 S. Ct. 2098 (books; reversing 1st Cir.); *Aday v. United States*, 388 U.S. 447, 87 S. Ct. 2095 (books; reversing 6th Cir.); *Avansino v. New York*, 388 U.S. 446, 87 S. Ct. 2093 (books); *Sheperd v. New York*, 388 U.S. 444, 87 S. Ct. 2093 (books); *Cobert v. New York*, 388 U.S. 443, 87 S. Ct. 2092 (movies); *Ratner v. California*, 388 U.S. 442, 87 S. Ct. 2092 (movies); *Friedman v. New York*, 388 U.S. 441, 87 S. Ct. 2091 (books); *Keney v. New York*, 388 U.S. 440, 87 S. Ct. 2091 (books); *A Quantity of Books v. Kansas*, 388 U.S. 452, 87 S. Ct. 2104 (books).

[43] *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S. Ct. 1676, 1683 (1964) (STEWART, J.).

a subjective analysis and that indulged in by the court below.[44]

Because of the wide difference of opinion on the Supreme Court, perhaps the only way to obtain a sense for the Court's attitude qua Court is to consider the views of each individual Justice. A breakdown of the individual votes in the eleven *Redrup* related cases reveals the following: Justices BLACK, DOUGLAS and STEWART predictably voted to reverse in each instance, but so did Justices WHITE and FORTAS. Justice BRENNAN voted to reverse the convictions in seven cases, to affirm two cases (both involving movies) without giving any reason, and to affirm one case on the authority of *Ginzburg* and to vacate and remand one case on the authority of *Memoirs*. Chief Justice WARREN voted to reverse in two cases, to affirm in two cases (both involving movies) without giving any reason, to affirm two cases on the authority of *Mishkin* and one on the authority of *Ginzburg*, to vacate and remand one case in light of *Memoirs*, and to set down three cases for oral argument. Justice CLARK[45] voted to reverse in two cases, to affirm in five cases without giving his reasons, to affirm two cases on the authority of *Mish-*

---

[44] See 35 Law Week 3430-31 (June 13, 1967) for a summary of the issues raised in the cases cited notes 41 and 42 supra. Examples of the paperbacks held not to be obscene in the constitutional sense are: "Lust Job", "Orgy Club", "Sex Life of A Cop", "Passion Priestess", and "Sin Warden." See especially the description of "Sex Life of A Cop" in *United States v. West Coast News Co.*, 357 F. 2d 855, 857-58 (6th Cir. 1966), rev'd sub nom, *Aday v. United States*, 388 U.S. 447, 87 S. Ct. 2095 (1967), reprinted in Appendix B.

[45] Because of his resignation at the end of the 1966 Term, Justice CLARK's personal views on obscenity may no longer be important. Moreover, since Justice CLARK has been the most conservative member of the Court vis-a-vis obscenity cases, even if his successor were to have the same views, it would have no appreciable effect on the current status of obscenity law.

*kin* and one on the authority of *Ginzburg* and to set down one case for oral argument. Justice HARLAN voted to reverse all cases coming from the federal courts and to affirm all those coming from state courts.[46]

None of the published works involved in the *Redrup* related cases comes close to having achieved the national recognition afforded "Candy." Indeed, to our knowledge, none of them were reviewed in any publication and none certainly appeared on any best seller lists.[47] Moreover, the reported opinions of the lower

---

[46] See Justice HARLAN's separate opinion in *Memoirs v. Massachusetts*, 383 U.S. 413, 455, 86 S. Ct. 975, 996 (1966) and *Roth v. United States*, 354 U.S. 476, 496, 77 S. Ct. 1304, 1315 (1957).

Two other cases decided on the last day of the Term, both involving convictions for distributing allegedly obscene movies, deserve passing mention. In one, *Wenzler v. Pitchess*, 388 U.S. 912, 87 S. Ct. 2096 (1967), the Court simply denied certiorari with Justices BLACK, STEWART and DOUGLAS noting that they were of the opinion that certiorari should be granted and a writ of habeas corpus issued on the authority of *Redrup*. In the other case, *Landau v. Fording*, 388 U.S. 456, 87 S. Ct. 2109 (1967), the Court granted certiorari and affirmed, Justices FORTAS, STEWART, DOUGLAS and BLACK noting dissents. Neither the majority nor dissenting judges cited any authority for their respective votes. The lower court opinion in *Landau*, 54 Cal. Reptr. 177 (Cal. App. 1966) reveals that the defendant's conviction was upheld on alternative grounds, viz., that the movie in question was constitutionally obscene and that the defendant was guilty of pandering. Significantly however the court noted an important distinction between obscenity *vel non* of movies and books: "Because of the nature of the medium, we think a motion picture of sexual scenes may transcend the bounds of the constitutional guarantee long before a frank description of the same scenes in the written word." 54 Cal. Reptr. at 181. Cf. the votes of Chief Justice WARREN and Justice BRENNAN in the eleven cases reversed on the authority of *Redrup*.

[47] For example, in *United States v. West Coast News Co.*, 228 F. Supp. 171 (W.D. Mich. 1964), aff'd, 357 F. 2d 855 (6th Cir. 1966), rev'd sub nom, *Aday v. United States*, 388 U.S. 447, 87 S. Ct. 2095 (1967) ("Sex Life of A Cop") (see Appendix B), the

courts indicate that no serious attempt was made to defend them on the ground of redeeming social importance. We can only conclude therefore that under both *Redrup* and the *Roth-Memoirs* test the court below erred in finding "Candy" constitutionally obscene.

Decree reversed; each party to pay own costs.

Mr. Justice JONES, Mr. Justice EAGEN and Mr. Justice O'BRIEN join in this opinion of the Court.

Mr. Justice COHEN took no part in the consideration or decision of this case.

APPENDIXES TO THE OPINION OF THE COURT:

## Appendix A

Excerpts from three reviews of "Candy":

1. Life Magazine, May 8, 1964. (A signed review by Nelson Algren, American author): "I don't know how reviewers reacted to *Alice in Wonderland* when it first was published. Something, I suspect, along the same lines as the Navy brass when first confronted with Admiral Rickover's fantasies. I do know how the professional critics ducked when Joseph Heller's *Catch 22* was published: and that it took a great wave of praise from England to force it upon their frighted sightlines. So far Terry Southern has suffered the same fate in this country.

. . .

defendants argued that the challenged work did not affront contemporary community standards and sought to introduce the following books in support of this contention: "Fanny Hill", "Tropic of Capricorn", "Lady Chatterly's Lover", "Naked Lunch", "The Carpetbaggers", "Cold Wind in August", "Clip Joint Cutie", and "Sin Binge." The district court refused to admit them, the first six on the ground that they were irrelevant because they were not similar to the book in question, and the last two because, while concededly similar, there was no proof they had become acceptable by community standards.

"One understands that, like Alice reproaching Humpty-Dumpty for the way he is holding her notebook, Candy too is saying, 'You're holding it upsidedown!' Candy is telling us that, in our insistence that sex is something foul, we are holding love upside-down. Southern's sense of the wildly comic disguises the fact that there is no more serious writer in the U.S. today than himself.

"The awkward truth he presents is that sex is not sick, but innocent. And worse yet to reviewers— Southern is an absolutely first-rate writer. So now the whole bicycling throng of literary begrudgers, too obsequious to oppose yet too chintzy to praise, too canny to hate and too careful to love, will have to pedal like mad to fit Southern to some acceptable preconception.

" 'He's like Nathanael West!' is sure to be one guess. 'No! he's Lenny Bruce!' another will insist. 'Hey! How about "A Beat Dean Swift"?' yet another may venture. 'Not at all! He's a combination of Orwell, Burroughs, Joe Heller and Evelyn Waugh.' None of which will be accurate. Nor will the inevitable comparisons to Henry Miller. Miller fought the tyranny of puritanical sex with puritanical fury. But two generations have passed since then, and it is possible to be more lighthearted about such matters today. *The Magic Christian, Candy* and *Dr. Strangelove* are the work of a major satirist. Furthermore, each are aspects of the same novel. In short, Southern is holding up a triple-angled mirror to America in which, given a rudimentary sense of humor, we are enabled to see ourselves as we really are.

"Nowhere has sex been sicker than in the U.S., and sick for so long we have forgotten it is supposed to be healthy. When sex is a joyous fulfillment instead of a wasting affliction, people can see that the most hilarious event in the history of mankind was the divi-

sion of the sexes. That is what Southern sees; and that is what Candy says."

2. Time Magazine, June 12, 1964: "Since pornography is now available at every neighborhood bookshop and drugstore, the idea of satirizing the pornographic novel was bound to occur to someone. If done with Swiftian skill, it could be defended on moral as well as literary grounds, even though it could easily descend to the level of a vice crusader's wet-lipped discourse on the evils of vice.

"*Candy* is as far from Swift as a French postcard is from Hogarth. Its heroine, Candy Christian, is that supposedly fictitious character—the girl who was ruined by a book. A glad-glanded college girl, she believes everything she reads or is told, and thus her pretty head is filled with every cliché in the current liberal establishment of ideas. Unhappily there is just one thing she can do for her country, for colonial freedom, for Zen enlightenment, for Freud, for minorities, and this she certainly does. For example, she takes the most improbable of her lovers, a cretin with a 'radish-white' humped back, because he is so loathsome that he constitutes a superminority of one.
. . .
"*Candy*, originally written for Paris' Olympia Press, which specializes in sheer lubricity, is not pornography. It may even be described as antisexual; all too often, at the crucial moment, everything goes askew, and Candy slips back into her flimsy panties, crying 'Good grief!' Its most conspicuous intent is to be more outrageous in detail than what it is satirizing, and these days, that is hard to do. In the effort, *Candy* ends up dirty as hell."

3. Newsweek Magazine, May 18, 1964: "Stand aside. Franny and Zooey; the age of Hadj and Zoon is upon us. The new era promises to be a good deal

more scatological than the old, and, to be quite honest about it, a lot more fun.

. . .

"Eager: The form of the story is episodic, like Voltaire's 'Candide,' which the heroine's name, Candy Christian, purposely recalls. But she is a very up-to-date heroine, peachy, pneumatic, and eager for defloration and all sorts of debauchery, which she is able to accept in good conscience as service to others as well as mystical self-realization.

" 'To give oneself—*fully*—is not merely a duty prescribed by an outmoded superstition,' the prurient Professor Mephesto assures her over an aphrodisiac sherry in his study, 'it is a beautiful and *thrilling* privilege!' After privileged encounters with libidinous doctors and a cretinous hunchback, Candy attains the esoteric camaraderie of the Cracker Foundation, a progressive coal mine like some sort of underground kibbutz, near Mohawk, Minn. From there, inflamed by a lecherously demanding guru ('. . . the mystic path is an arduous path . . .'), she undertakes a pilgrimage to Tibet and what must surely be the most marvelously scabrous denouement in modern letters—the climax of a Greek tragedy rewritten by Nathanael West and S. J. Perelman.

"The stylistic mixture sounds fantastic, and it is. It also sounds uncomfortably lumpy, and yet, surprisingly, it isn't. Although, the two authors write alternately, the texture is remarkably even, and Southern gave the whole script a final fond erotic polish."

Appendix B

For purposes of comparison with the reviews excerpted in Appendix A (see also notes 30, 44, 47 and accompanying text) we have included the Court of Appeals' description of "Sex Life of A Cop", held not

constitutionally obscene in *Aday v. United States,* 388
U.S. 447, 87 S. Ct. 2095 (1967). The description ap-
pears in *United States v. West Coast News Co.,* 357 F.
2d 855, 857-58 (6th Cir. 1966) : "We will not attempt
illumination by extensive recital of the book's contents.
This short description will suffice. Sex Life of A Cop
is a paperback with a cover picturing a woman (the
wife of the Mayor of the town) trying unsuccessfully
to hide her nakedness behind the grotesque, underwear-
clad figure of the town's Chief of Police, both of them
having been interrupted in their lovers' lane dalliance
by two of the town's police officers. The latter pair
are the heroes of the narrative. Their discovery of the
Chief and his lady was not the product of zeal to en-
force the law, but of their effort to beguile the monoto-
ny of their round of duty by such surprise intrusions.

"Inside the covers are pages which the defendants'
experts call 'blurbs'. These are short, but meaty, ex-
cerpts from other books available from the publishers,
and give prurient promise of the books' contents. They
demonstrate that the publisher, at least, suffered from
no illusions as to the interests to which the book was
directed. One of the blurbs, however, has an intellec-
tual flavor. It identifies as an author, Wallace De-
Ortega Maxey, Doctor of Divinity, whom we assume
to be the defendant of the same name. 'Dr. Maxey' is
described as a minister who has cast off the shackles
of prudery, (now an evangelist for freedom) whose
'views are in sharp contrast with those of most minis-
ters, but so were the views of Columbus with those of
the other navigators of his time. The new idea replaces
the old; the world is not flat.'

"The 147 pages of the alleged novel are generously
faithful to the promises of the blurbs. Without palliat-
ing interruption, the story moves quickly from one
sexual enterprise to another. So numerous are these
events that even the practiced skill of the author runs

out of fresh imagery and dully repeats his supply of leering adjectives. The chief actors are a police sergeant and his fellow occupant of the appropriately named. 'prowl car'. These officers, except for some needed rest from their amours, devote most of their on-duty and off-duty hours to successful sex encounters with whatever females come within their view. Their conquests range from a virgin to a '100 dollar' prostitute. The wives of the Chief of Police and the Mayor of the town, the new female police dispatcher, friendly waitresses, two nurses who promptly take off their clothes when the busy officers, otherwise unheralded, climb through their open window, a drunken 'society' lady who is first rescued from a corner lamppost and then raped in the back seat of the prowl car, and a miscellany of other willing ladies, make up the cast. Every female identified in the story is easy prey for the officers. With their husbands away, some married ladies gain the officers' sexual services by false night calls to the police dispatcher complaining of a 'prowler.' Chivalrous response by the prowl car is rewarded by amorous receptions. Even the wife of his fellow officer is not overlooked by Sergeant Thorne. The drama concludes with a smashing *denouement* when the sergeant discovers, as an eyewitness, that his own beloved Alice has been enjoying his outranked, prowl-car-pal's offerings. The moral lesson of retribution, which defendants' experts claim gives this book a social value, subtly emerges in the cuckolded sergeant's plaintive soliloquy 'What in the world have I ever done to deserve this?' Thus ends the play."

---

CONCURRING OPINION BY MR. JUSTICE JONES:

Most reluctantly, I join with the majority of this Court in reversing the decree of the court below. Were it not for the decisions of the United States Supreme Court in this area of the law—decisions which are

binding upon us—I would have no hesitation in determining that "Candy" is an obscene book. Although the United States Supreme Court has not specifically held that "Candy" is not obscene, my review of its pronouncements on what is and what is not obscene convinces me that "Candy" does not satisfy its definition of an obscene book.

In reaching this conclusion, I want to reiterate my agreement with the view expressed by Mr. Justice ROBERTS in his concurring opinion in *Commonwealth v. Robin*, 421 Pa. 70, 72, 73, 218 A. 2d 546, 547 (1966) that the decisions of the United States Supreme Court do not "preclude governmental action designed to shield our juvenile population from the potentially adverse effect of premature exposure to" books such as "Candy", "Tropic of Cancer", etc. The easy access of such books to those of juvenile age is a matter of serious concern and to this problem our Legislature should address itself. In my opinion, the Legislature has not only the power but the duty to prevent access to such books of those who "lack the emotional maturity and judgment to place [such books] in proper perspective". (*Robin*, supra, p. 73).

Mr. Justice EAGEN and Mr. Justice O'BRIEN join in this concurring opinion.

———

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

I dissent. The reading of even a few pages of or excerpts from "Candy" clearly discloses that it is a very obscene, lewd, filthy book, without a single redeeming feature. It is a vivid portrayal of sexual life in which sex is glorified as a way of life.

In the light of recent decisions of the Supreme Court of the United States, no one can be sure what is "obscenity." It is not clear whether the Supreme Court believes that the First Amendment protects freedom

of speech absolutely,\* without any limitations, or whether it merely holds that a book or any publication is not obscene unless it violates each of the following three tests:

1. The book or publication must appeal to "prurient" interests in sex—not more than a handful in every thousand persons understand what prurient means.

2. The second test apparently required by a majority of the Supreme Court is that before a finding of legal obscenity can be sustained, the evidence must show that "the material is patently offensive because it affronts contemporary community standards\*\* relating to the description or representation of sexual matters." *Memoirs v. Massachusetts,* 383 U.S. 413, 418; *Jacobellis v. Ohio,* 378 U.S. 184; *Roth v. United States,* 354 U.S. 476.

3. A book or publication cannot be proscribed unless it is found to be "utterly without redeeming social value."

In *Memoirs v. Massachusetts,* 383 U.S., supra, the Court said (page 418): "We defined obscenity in Roth in the following terms: '[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.' 354 U.S., at 489. Under this definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material

---

\* Freedom of speech is not absolute and unlimited. For example, a person is not protected by the First Amendment if he slanders or libels someone (with certain nonpertinent exceptions), or if he yells "fire" in a theatre or crowded place without any justification, or if he advocates treason against our Country.

\*\* The Court has been unable to agree on the meaning of community standards—whether the words apply to the Nation at large or to some local or smaller sector.

taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value."

To briefly summarize: The Supreme Court cannot define obscenity in language which a majority of Judges or of lawyers or of laymen understand. However, notwithstanding the fact that it is high on the "best sellers list" and its wide popularity, "Candy"* is a very obscene, dirty "sex" book without a single redeeming feature or the slightest social value, and no matter what legal test is applied it should be banned.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Supreme Court of Pennsylvania had an opportunity in this case to unlimber some heavy artillery in fighting for American morality; it had unlimited freedom to pour devastating fire into the forces that would destroy the very foundations of decency, purity and wholesome conduct upon which our American society is founded; it had the clearest chance to draw from the armory of the law the weapons which would beat back those who, for greed and lucre, would poison the minds of the youth of our Commonwealth. The Supreme Court, however, did none of these things. The Majority of this Court retired from the field of battle without firing a shot. It did more. It encouraged the foul foe to smash more effectively at the bastions of American decency; it unfurled a flag of impeccability and authority over the invading filthy battalions; it supplied to each hoodlum in the putrid expeditionary

---

* See, for example, TIME Magazine which apparently approves it even though it describes the book as "dirty as Hell."

force a bar of Ivory Soap which made him, according to the Majority's reasoning, 99 1/2% pure!

I disassociate myself, as far as I can, intellectually, jurisprudentially, and philosophically, from the decision of this Court in this case.

Here was a case where this Court could have declared that the book under consideration was so devoid of literary merit, so odious in its presentation of its immoral theme, so obviously designed to appeal to the baser animalism of man, that its sale and distribution should be outlawed in Pennsylvania. Whom would such a decision have hurt or offended? No one but those who are heaping up sordid dollars, as a rake gathers up rotten leaves in an abandoned and unseeded garden.

The Majority Opinion says that "our decision in this case . . . should not, in any manner, be construed as an approval of 'Candy.'" How else can it be construed? The Majority's statement is like saying that the Court does not approve of a snake entering a nursery but forbids anyone to build a fence around the nursery to keep the serpent out. I reject as untenable the pious statement that the Majority does not approve of "Candy" when the opinion oleaginously oozes with praise of this filthy book. It points out that "Candy" sold over 2 1/2 million copies in the hard cover edition. How does that establish that it is not obscene? There are millions of persons who use narcotics which admittedly are ruinous to health. Does that say that narcotics should be sold freely?[1]

The Majority Opinion calls the central character in "Candy" the "heroine." This "heroine" is a prostitute, a degenerate, a deviate, and a defiler of the truth.

---

[1] Hitler's "Mein Kampf" reached a sale of over ten million. Would the Majority say that that book did not have an evil influence and did not contribute to the horrible atrocities perpetrated on the Jewish people?

The Majority Opinion appends glowing testimonials of the book from certain periodicals. It quotes from one review: "Nowhere has sex been sicker than in the U. S., and sick for so long we have forgotten it is supposed to be healthy."

How healthy a book is "Candy"? What salubriousness does it contribute to the moral health of the nation? The book revoltingly describes in detail a sexual act between a father and his daughter, it portrays the debauching of a niece by her uncle, it relates a disgusting perversion between a girl and a depraved, deformed man, it speaks of unnatural practices which would make the beasts of Sodom and Gomorrah ashamed. And this is what the periodical the Majority cites with approval calls healthy sex!

One book quoted by the Majority declares the book is not pornographic but concedes it is "dirty as hell."

The Majority Opinion states: "It is generally conceded, by the book's friends and foes, that it is a satire or at least an attempt at satire upon the cultural ideals of our contemporary society."

This statement is wholly unsupported by the facts. I can be listed as one of the book's foes and I certainly do not regard it as a "satire upon the cultural ideals of our contemporary society." There is nothing in the ideal culture of our contemporary society which remotely resembles the reprehensible conduct, the bestial practices described in "Candy."

Then the Majority quotes from one of the defenders of the book who said that "Candy" is a "spoof on sex." "Candy" is as much a spoof on sex as a garbage dump is a spoof on a garbage dump. "Candy" *is* the garbage dump. It is rotten-core pornography. It is not a satire on pornography, it is not a spoof on sex, it is plainly an outrageous display of depravity in its most loathsome forms. Those who attempt to defend the book as a work of satire, culture, or literary art would never ad-

mit that they would look with favor upon their children reading it.

The Majority is not content to quote from reviews of "Candy." It gratuitously shovels into its opinion, and thus further burdens, as well as contaminates, the pages of the Pennsylvania State Reports, libidinous comments on another book, as they appeared in a Federal court case.[2] The Majority points out that there are other books more obscene than "Candy." In this, the Majority apparently proceeds on the theory that since "Candy" is surpassed in degeneracy by other vile works, "Candy" should not be subject to injunction under Pennsylvania laws. This is like saying that a person in the early stages of a contagious venereal disease may not be excluded from waiting on the dining table because there are syphilitics working in the kitchen.

Thus, the Majority tells of other purveyors of sewage, such as "Memoirs of a Woman of Pleasure," "Naked Lunch," "Tropic of Cancer" and similar pornographic junk, and argues that since they were not banned, "Candy" has at least a minimum or modicum of "social value." But the Majority does not give the slightest hint of what that "social value" is. It apparently advances the theme that a community of people should not object to being pushed into a mud pond because there are other communities which permit cesspools where frogs and lizards revel in natatorial slime.

The Majority admits that "Candy" is an obscene book, but then in an astonishing non sequitur declares that it cannot be banned because it does not go. "far beyond customary limits of candor." What does the Majority regard as the limits of candor? Is it customary candor for decent people to discuss in intimate

---

[2] That book not only deals with pornography but it defames police officers as profligates and sensualists.

detail the dung-covered incestuous conduct described in the book? Do people in decent society employ the gutter language spoken by the execrable radish-white humped back cretin in the book? The answer is obvious, yet the Majority finds that this maggoty language is customary candor. In what neighborhood does the Majority hear this "customary candor" billingsgate?

The Majority Opinion is a long one; it is erudite, complicated, and as studded with citations and footnotes as a broken plank with bent nails, but it never comes to grips with the problem the litigation presents. The Act of June 1, 1956, P. L. (1955) 1997, as amended, 18 P.S. §3832.1, under which the District Attorney proceeded in this case, proclaims against the sale or distribution of a book which "constitutes a danger to the welfare" of the community. Nowhere in the 28-page Majority Opinion is there the slightest discussion of the baleful effects on communities of an obscene book. One of the specific findings of fact of the court below reads: "Circulation and distribution of the book 'Candy' constitutes a danger to the welfare of the community."

The Majority Opinion makes no mention of this formidable finding which has the standing of a jury's verdict. It disposes of the case by saying that the decision of the court below was "subjective." What else could it be? A judge trying a murder case does not go out and commit a murder in order to learn what murder is. He reaches a conclusion after hearing the evidence, and that is what the lower court did, and that is what the Majority of this Court did not do. If there is an opinion that is subjective, it is the Majority Opinion. It is not only subjective, it is academic, theoretical and discursive, with considerable hypothesis and it contains even a dash of prediction as to what

the Supreme Court of the United States will do, a daring proposition indeed.

Prohibition against obscenity is not only a matter of cleanliness and godliness; the health of the community is involved. It has been established in thousands of cases that there can be a direct connection between abnormal sex books and sex crimes. Those who profess not to see this connection are either abysmally ignorant or refuse to accept the truth. I quote from some authorities on the subject: Dr. Nicholas G. Frignito, Psychiatrist of the County Court of Philadelphia: "The most singular factor inducing the adolescent to sexual activities is pornography; the lewd picture, the smutty book, the obscenely pictured playing card, the girlie magazines . . . pornography fosters impure habits and desires . . . it can cause sexually aggressive acts and in some instances lead to the slaying of the victim". J. Edgar Hoover: "Sex-mad magazines are creating criminals faster than jails can be built to house them". The late Dr. Benjamin Karpman, Chief Psychotherapist, St. Elizabeth's Hospital, Washington, D.C.: ". . . there is a direct relationship between juvenile delinquency, sex life and pornographic literature". The National Council of Juvenile Court Judges, in a resolution: "The character of juvenile delinquency has changed as a consequence of the stimulation of salacious publications, being no longer the mischievous acts of children, but acts of violence, armed robbery, rape, torture and even homicide, for which the vicious publications condition the minds of our children". Inspector Herbert Case, Detroit Police Department: "I have yet to see a sex murder case in the history of the Detroit Police Department but what I can show you obscene literature . . ." Detective Lt. Austin B. Duke, St. Louis County Police: "I have never picked up a juvenile sex offender who didn't have this stuff with him, in his car or in his house".

O. W. Wilson, Chicago Police Superintendent: "Obscene literature is a primary problem in the United States today. Sexual arousals from obscene literature have been responsible for criminal behavior from vicious assaults to homicide". Dr. Max Levin, Psychiatrist, New York: "I am convinced pornography is undermining the mental health of countless youngsters . . . whose personalities are being warped by harmful influences in their early years . . . Unscrupulous publishers cater to their sex hungers, and their lurid books are hot numbers on newstands, in candy stores and wherever teenagers gather".

Why have there been laws against obscenity reaching back into the days of antiquity? It is because obscenity, lewdness, lasciviousness strike at the very moral fiber of a people and, when that disintegrates, a nation perishes. Justice HARLAN said in the *Roth-Alberts* case (354 U.S. 502), that "The State can reasonably draw the inference that over a long period of time the indiscriminate dissemination of materials, the essential character of which is to degrade sex, will have an eroding effect on moral standards." We know that Rome was great and went into decline; that Greece was the flower of culture, and that weeds finally grew in the Acropolis; that the Persian, Egyptian, Babylonian and numerous other civilizations were powerful, rich and indomitable but something happened to them and they moldered into decay—not because of armed invasion from without their gates, but from moral deterioration within their walls.

In 1874 Justice SWAYNE, speaking for an unanimous United States Supreme Court, declared: "The foundation of a republic is the virtue of its citizens. They are at once sovereigns and subjects. As the foundation is undermined, the structure is weakened. When it is destroyed, the fabric must fall. Such is the voice of history.": *Trist v. Child,* 21 Wall. 441, 450.

The contemporary United States Supreme Court has drifted far from the wisdom and fundamental democratic philosophy inherent in the above quotation. The Majority Opinion in the case at bar seeks to justify its conclusions citing from recent decisions of the Court on Capitol Hill in Washington. Those decisions are a lighthouse with broken beams. The majority opinions of the present U. S. Supreme Court, on the subject of obscenity, constitute a never-never land of confusion and self-contradiction. Taken in the aggregate, those opinions suggest a region hazy with drifting fogs, beset with contrary wind currents, criss-crossed with labyrinthian, tortuous foot trails, perforated with pitfalls and tortured with quicksands, which no legal traveler could hope to traverse and emerge therefrom with a precise knowledge as to where he had been, what he had seen, and where he was now going. It is with regret that I say this, but it is with conviction, based on intensive study of late Supreme Court decisions, that I say the Court itself does not seem to know where it is going on this subject which affects the homes, the welfare, and the moral standards of the nation.

I state, again with reluctance, that the Supreme Court of the United States has failed to measure up to its responsibilities in this area of the law. I have respect for the highest Court in the land, I am bound by its decisions, but I wish it would make up its mind as to what is its decision in this realm of jurisprudence. I will illustrate my point by quoting from the Majority Opinion in this case, namely: "Because of the wide difference of opinion on the Supreme Court, perhaps the only way to obtain a sense for the Court's attitude qua Court is to consider the views of each individual Justice. A breakdown of the individual votes in the eleven *Redrup* related cases reveals the following: Justices BLACK, DOUGLAS and STEWART predictably voted to reverse in each instance, but so did Justices

WHITE and FORTAS, Justice BRENNAN voted to reverse the conviction in seven cases, to affirm two cases (both involving movies) *without giving any reason,* and to affirm one case on the authority of *Ginzburg* and to vacate and remand one case on the authority of *Memoirs.* Chief Justice WARREN voted to reverse in two cases, to affirm in two cases (both involving movies) *without giving any reason,* to affirm two cases on the authority of *Mishkin* and one on the authority of *Ginzburg,* to vacate and remand one case in light of *Memoirs,* and to set down three cases for oral argument. Justice CLARK voted to reverse in two cases, to affirm in five cases *without giving his reasons,* to affirm two cases on the authority of *Mishkin* and one on the authority of *Ginzburg* and to set down one case for oral argument . . ." (Emphasis supplied)

The reason so many Justices gave no reason for their decisions is that there is no reason to the decisions. The decisions are a conglomeration of personal views, individual tangents and private predilections, without much thought apparently being given to the effect those decisions will have on the nation as a whole. I state, again with disinclination, that the Supreme Court of the United States has failed to live up to its solemn responsibility of protecting, through a serious interpretation and firm enforcement, of the laws of the land, the ramparts of moral standards, the crumbling of which will bring disaster to our country. The Supreme Court has simply refused to meet its obligations in considering a grave situation which affects American youth, into whose hands the destiny of our nation will one day be committed.

When this case was being considered by the court below, decision was delayed awaiting clarification of the whole problem of obscenity by the highest court of the land. On March 21, 1966, the Supreme Court spoke though 14 opinions handed down in three cases. The

lower court called the Supreme Court decisions "a congeries of pronouncements," in which it looked "in vain for the anticipated illumination." Also, "we feel that the mountain has labored and brought forth a litter of mice."

Dismay was spoken by many periodicals in the land. The New York *Herald Tribune* declared in a headline: "Supreme Court Compounds the Obscenity Confusion;" the Philadelphia *Inquirer* headlined: "Muddy Issue of Legal Obscenity"; the Washington *Post* described the Court's decisions as "murky"; The *New Leader:* "The already rickety concept of obscenity has been reduced to constitutional rubbles"; Newsweek: "Dizzying . . . leaving an already tangled body of law more puzzling than ever;" *London Economist:* "An astonishing decision;" Chicago Daily News: "Once more, the Court has failed to find a definition of obscenity;" *Library Journal:* "Incredibly jumbled decision;" Toledo *Blade:* "A Morass." Chicago *Tribune:* "A lot of tortuous logic."

Now, if the Court's failure to discharge its judicial duties in this field resulted only in verbal confusion, one could overlook shallow study, nebulous syntax, vocabular circumlocution and indifference to stare decisis, but the tragedy is that, with confusion at the sentinel gate, the pornographic thieves steal into the citadel of our moral security. Because of unconcerned laxity at the ramparts, the explosives fashioned by the arch pornographer of America, Henry Miller, are being maneuvered under the very foundation of the Ten Commandments. There is not one principle in the Decalogue that Henry Miller has not in his books defiled, denounced, despoiled and defamed. And yet the Supreme Court found no violation of the law in his unspeakably degenerate "Tropic of Cancer."

Judge STEPHENS described the "Tropic of Cancer" and its companion "Tropic of Capricorn", as follows:

"The vehicle of description is the unprintable word of the debased and morally bankrupt. Practically everything that the world loosely regards as sin is detailed in the vivid, lurid, salacious language of smut, prostitution, and dirt. And all of it is related without the slightest expressed idea of its abandon. . . The author conducts the reader through sex orgies and perversions of the sex organs, and always in the debased language of the bawdy house. Nothing has the grace of purity or goodness. These words of the language of smut and the disgraceful scenes, are so heavily larded throughout the books that those portions which are deemed to be of literary merit do not lift the reader's mind clear of their sticky slime." (*Besig v. U.S.,* 208 F. 2d 142.)

The publishers of "Tropic of Cancer" referred to its author Henry Miller as a "respected writer." Judge CARROLL of the Philadelphia Court of Common Pleas replied: "I can't believe a man is a respected writer who would say he would give a kick in the pants to God, who would call the Jews kikes, and the colored people niggers. . . He insults the very image of Christianity, he insults the Jewish race—and this is apart from the obscenity." (*Com. v. Robin,* 421 Pa. 70.)

But the Supreme Court of the United States found "Tropic of Cancer" worthy of lodgment and circulation in the public libraries of the land, allowing that foul and festering monstrosity to circulate with the Bible, Pilgrim's Progress, Homer's Iliad and Shakespeare's Works.

The Supreme Court of the United States has written scores of decisions on obscenity. It has laid down rules, expounded principles, established standards and then later ignored or dismissed them all. It draws fine line distinctions in the areas of community standards, prurient appeal, contemporary society, social value, etc., and then proceeds, in effect, to offer in one form or another, a free passport to every book which

comes before it, no matter how degraded or vile it may be. It is a significant fact, as admitted by the Majority Opinion in this case, and I quote from the opinion: "The Court (Supreme Court of the United States) has yet to find a published work obscene per se."! !

I do not believe that the framers of our nation's Constitution ever intended that the judges of the Supreme Court were to perform as super-censors on books. The question of the propriety of the distribution of questioned literature should be left to the States where it was prior to 1787 and which no one at that time ever thought of transferring to the nation. In 1887 the Supreme Court acknowledged that it was the province of the legislative department of government to exercise the necessary police powers to stand guard over public morality: "The power to determine such questions (what is offensive to public morality) so as to bind all, must exist somewhere; else society will be at the mercy of the few, who, regarding only their own appetites or passions, may be willing to imperil the peace and security of the many, provided only they are permitted to do as they please. Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as police powers of the state, and to determine primarily what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety." (*Mugler v. Kansas,* 123 U.S. 623.)

Nevertheless, the Supreme Court has deliberately assumed jurisdiction over the millions of books, pamphlets, magazines and newspapers in the land, a jurisdiction it cannot possibly cope with. And then to make matters worse, it attempts to apply a yardstick which can have no application to realities. The standard for determining obscenity, as laid down in the *Roth* case, is "whether to the average person, applying contemporary community standards, the dominant theme of

the material taken as a whole appeals to prurient interest."

What is a community? It is a region, a circumscribed area as a town, village, neighborhood. In its broadest concept it could possibly envelop a State, but it is contrary to common usage to apply the word "community" to a nation, and this is what the Supreme Court has done. (*Jacobellis v. Ohio*, 378 U.S. 184.)

But, even after arbitrarily giving to community a national significance, the Supreme Court has ignored the moral standards of the American people as a whole. It has fashioned most of its decisions on obscenity on the views and attitudes of an infinitesimal minority, literary critics and book reviewers, who, with their admitted talents, cannot possibly speak for the masses not so sophisticated as those who make the reviewing of books their profession.

This summary seizure of jurisdiction by the Supreme Court in this field has worked, and continues to work, havoc in the individual states which are frequently compelled to wait for decisions from Washington as to whether a certain book may or may not be sold at a newstand in a village in North Dakota. And more often than not, the expected decision turns out to be so cloudy in exposition and disposition that the pornographic culprit escapes under cover of the rhetorical smoke.

The decisions of the United States Supreme Court in obscenity cases have raised alarm in the most venerable places of the nation—the home, the church, and the school.

The Philadelphia *Inquirer* published in September of this year four articles written by Joseph C. Goulden of the *Inquirer* Staff, entitled "Merchants of Smut." No one can read this extremely well written series of the appalling extent of pornographic literature being sold and consumed in Philadelphia and the vastness of

mail order pornography polluting the mails of the nation, without being concerned over what is to happen to. the minds of the youth in America. I quote briefly from this series which should be required reading for prosecuting officers and judges: "The legalization of pornography has touched off a commercialized smut boom in Philadelphia that it is bringing the dirty books from their traditional under-the-counter hiding places. . . . Commercialized pornography thrives because the low-grade smut dealers operate under the same umbrella of constitutional rights that the Supreme Court originally unfolded for works of a serious literary nature."

: · The Pennsylvania Supreme Court missed a coveted opportunity in the case at bar to strike a blow for decency, since the U. S. Supreme Court has not yet passed on the book which is the subject of the current legislation. Of course, one could well imagine that, after the U. S. Supreme Court allowed the British pandering whore Fanny Hill to pass into the temple of purity, it would not bar entrance to the frowzy, streetwalking, subterranean harlot "Candy." Still, this Court could have made the effort to save a few Pennsylvania children from the stench of "Candy" because a little time might elapse between our banning it and the Supreme Court's striking down the ban.

And then there could always be the possibility, as remote as it seems today, that the U. S. Supreme Court might respect its historical pronouncements that freedom of the press does not include the publication of obscenity. In *Chaplinski v. New Hampshire*, 315 U.S. 568 (1942), the high Court said: ". . . There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any constitutional problem.. These include the lewd and obscene. . . It has been well observed that such utterances are no essen-

tial part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."

Ten years later, the U. S. Supreme Court declared in *Beauharnais v. Illinois*, 343 U.S. 250: "Certainly no one would contend that obscene speech, for example, may be punished only upon a showing of such circumstances (clear and present danger). . ."

Then in 1957 the Court said, in *Roth v. U.S.*, 354 U.S. 476 that "implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance." But what about 1967? Does the present Supreme Court, with its emphasis on ad hoc reasoning, consider 1957 too ancient to control 1967?

The Majority Opinion in this case, went to a great deal of care to discuss, dissect and describe the above quoted sentence from the *Roth* case, and said it was "logically circular." Then it said: "On the one hand, one can conclude, as do Justices CLARK and WHITE, that obscenity by definition has no redeeming social importance. On the other hand, Justice BRENNAN believes that a work which has even a minimum of social importance is by definition not obscene, a view shared by Chief Justice WARREN and Justice FORTAS. Since Justices BLACK, DOUGLAS and STEWART believe that the BRENNAN approach is too restrictive, we must accept the BRENNAN analysis as 'settled law' with respect to obscenity vel non, at least until five members of the Court agree on a new definition. This is because simple arithmetic shows that the votes of the 'BRENNAN block' along with that of the 'BLACK-DOUGLAS-STEWART Axis' will, of necessity, result in a finding that the work, in the absence of pandering, is entitled to constitutional protection."

238

From all this we conclude that the Majority of this Court, by taking into the chamber of consideration and consultation an arithmetic table, a block, an ax, and circular logic, arrived at the conclusion that there could be no use in waiting to see what the Supreme Court might say in "Candy," and thus, with a circular saw, it sawed away the rights of the people of Pennsylvania to be saved from the inundation of filth gushing from the pages of a book which the Majority finds possesses a minimum of social importance but never explains why.

Because, of course, it cannot!

From Pittsburgh to Philadelphia, from Dan to Beersheba, and from the ramparts of the Bible to Samuel Eliot Morison's Oxford History of the American People, I dissent!